NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11390

THE WOODWARD SCHOOL FOR GIRLS, INC.  vs.  CITY OF QUINCY,
trustee,[1] & another.[2]


Norfolk.     December 2, 2013. - July 23, 2014.

Present:  Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.


Trust, Charitable trust, Investments, Trustee's accounts.
    Damages, Breach of fiduciary duty, Interest.  Interest.
    Massachusetts Tort Claims Act.  Governmental Immunity.
    Immunity from Suit.  Municipal Corporations, Trusts,
    Governmental immunity.  Waiver.  Laches.



     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on July 11, 2007.

     After transfer to the Norfolk County Division of the
Probate and Family Court Department, the case was heard by
Robert W. Langlois, J.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     John S. Leonard (James S. Timmins, City Solicitor, with
him) for city of Quincy.

---

[1] Of the Adams Temple and School Fund and the Charles
Francis Adams Fund.

[2] Attorney General, as a nominal party.

Sarah G. Kim (Josephine M. Deang Chin & Alison K. Eggers with her) for the plaintiff.

CORDY, J. This dispute arises from a trust established in 1822 by former President John Adams and supplemented by a bequest of his grandson in 1886. The city[3] of Quincy (Quincy) served as trustee of the Adams Temple and School Fund and the Charles Francis Adams Fund (collectively, Funds) through two boards.[4] The Woodward School for Girls, Inc. (Woodward), the income beneficiary of the Funds since 1953, filed suit against Quincy initially seeking an accounting and thereafter asserting that Quincy committed a breach of its fiduciary duties to keep adequate records, invest the trust's assets properly, exercise reasonable prudence in the sales of real estate, and incur only reasonable expenses related to the management of the Funds. We transferred the case here on our own motion following Quincy's appeal and Woodward's cross appeal from a Probate and Family

---

[3] Quincy, originally a town, was incorporated as a city in 1888. See St. 1888, c. 347.

[4] For the purposes of this opinion, the city of Quincy, along with the board of supervisors and the board of managers (together, joint boards) of the Funds at issue (the Adams Temple and School Fund, or Adams Fund, and the Charles Francis Adams Fund, collectively, Funds) are referred to collectively as "Quincy," except where differentiation is helpful.

Court judge's ruling removing Quincy as trustee and ordering it to pay a nearly $3 million judgment.[5]

On appeal, Quincy asserts that the trial judge erred in finding that Quincy committed a breach of its fiduciary duties to the Funds by failing to invest in growth equities to protect the principal when the Funds have only an income beneficiary to provide for, and by not heeding specific investment advice it received in 1973. In addition, Quincy challenges the award of damages, alleging that it was based on an improperly introduced and unsound portfolio theory hypothesizing unrealized gains; that it failed to exclude reasonable costs and expenses Quincy would have incurred had Quincy followed that portfolio theory; and that it improperly included prejudgment interest dating back to the dates of the various breaches. Finally, Quincy avers that Woodward's claims should have been barred by the Massachusetts Tort Claims Act, G. L. c. 258, § 4, and its accompanying protection of sovereign immunity, and by the equitable doctrine of laches.

For the reasons discussed below, we conclude that the claims were not barred, and judgment against Quincy for committing a breach of its fiduciary duties to the Funds was proper, but the award of damages was erroneous in the

---

[5] The parties have stipulated to the consolidation of the appeals.

calculation of unrealized gains on the investment portfolio. Specifically, we conclude that the judge erred in two respects: first in finding that Quincy's failure to heed specific investment advice it had solicited constituted a breach of its duty to act as a prudent investor, and second in calculating as damages the gains that might have been realized had Quincy followed that advice. Nonetheless, because there was other evidence of Quincy's mismanagement of the Funds, the judge did not err in finding that Quincy had committed a breach of its fiduciary duties with regard to them.

We further conclude that the judge did not err in including prejudgment interest or in declining to speculate as to potential costs or expenses Quincy may have incurred with proper management. However, because the judge's calculation of damages with regard to the unrealized gains on the investment portfolio was based on his incorrect assumption that Quincy was required to follow specific investment advice, that calculation was in error. Accordingly, we affirm the judgment as to liability, reverse with respect to the calculation of damages on the unrealized gains, and remand for further proceedings consistent with this opinion.

Background. In 1822, former President John Adams executed two deeds of trust, conveying a portion of his real estate holdings to a trust, thereafter named the Adams Temple and

School Fund (Adams Fund), and naming Quincy as the trustee.  The first deed executed by President Adams (Deed A) was supplemented by a bequest of his grandson, Charles Francis Adams, in 1886, to support the objectives of the Adams Fund (Charles Francis Adams Fund, and, collectively with the Adams Fund, Funds).  Deed A contained the basic provisions of the trust and directed the trustee to invest earnings from the real estate "in some solid public fund, either of the Commonwealth, or of the United States"; to build a church; and to apply "all future rents, profits, and emoluments, arising from said land" to support a school with particular requirements.  The only principal beneficiary identified in the deed was the oldest living male descendant of President Adams, who was to receive the principal only on "gross corruption or mismanagement," or knowing waste, on the part of Quincy.  Shortly after the deeds were executed, the inhabitants of Quincy voted to accept the gifts therein, and Quincy became the trustee.

Two acts of the General Court granted Quincy further authority in executing its responsibilities as trustee of the Funds.  In 1827, the General Court appointed the treasurer of Quincy as the treasurer of the Adams Fund, incorporated the board of supervisors, and authorized the board of supervisors and the selectmen of Quincy to execute the intentions of President Adams and to receive and manage gifts from others for

the purposes articulated in the deeds.  See St. 1827, c. 59

(1827 Act).  Quincy thereafter established a board of managers

for the Adams Fund.[6]  In 1898, the General Court authorized

Quincy as trustee of the Funds to sell and convey the Funds'

real property holdings and to "invest[] and re-invest[]" the

sale proceeds "from time to time . . . in real estate or in such

securities as trustees are authorized to hold in this

Commonwealth."  See St. 1898, c. 102 (1898 Act).

In 1953, pursuant to an unpublished order of this court,

after three prior income beneficiaries, Woodward was designated

(and remains) the sole income beneficiary of the Funds.[7]

---

[6] The board of managers of the Adams Fund was comprised of
the mayor of Quincy, the president of the city council, the
treasurer and collector, and two members elected annually by the
city council.  See § 2.144.020 of the General Ordinances of the
City of Quincy.  It appears that whereas the board of
supervisors and the board of managers shared responsibility for
overseeing the Adams Fund, only the board of supervisors oversaw
the Charles Francis Adams Fund.

[7] The Woodward School for Girls, Inc. (Woodward), was
established and operated by the Woodward Fund, a trust created
by the will of Dr. Ebenezer Woodward, a cousin of President John
Adams, in 1894.  This fund was also managed by Quincy, but its
board of managers was separate from those of the Funds.  In
1952, Quincy filed a petition asking that the Funds be used to
benefit Woodward, which was experiencing financial troubles.
This court granted the petition and ordered that "the net income
from the [Funds] . . . be paid to and expended by the City of
Quincy in its capacity as trustee of the Woodward Fund and
Property for the conduct, operation, maintenance, management,
and advancement of the Woodward School for Girls."  The Woodward
Fund was subsequently liquidated.  In his findings in the
present dispute, the judge noted that the cy pres decree "did
not . . . provide a requirement for any annual, quarterly, or

1.  <u>Investment advice and state of Funds</u>.  By the time Woodward became the beneficiary of the Funds, the real estate holdings of the Adams Fund had diminished significantly, presumably due to sale.  At the end of 1952, the assets of the Adams Fund consisted of $4,474 in cash, $253,723.02 in investment assets, and an assessed value of $102,325 in real estate.  The value of the Adams Fund's investment assets in 1973 totaled $321,932.43, an increase that may have been attributable to the further sale of real estate.  In April, 1973, the Adams Fund investment assets were invested in a portfolio consisting of ninety per cent fixed income and ten per cent equity securities.  That month, Quincy received investment advice it had requested from the South Shore National Bank (bank) with regard to managing the Funds' investment portfolio.  The joint boards of the Funds unanimously voted to adopt an agreement establishing an advisory relationship with the bank and to follow certain diversification investment advice it received from the bank.  However, Quincy never implemented the diversification recommendations, and instead, by 1990, nearly one hundred per cent of the Adams Fund's assets were invested in fixed income instruments.  In 2008, the value of the investment

---

even periodic, income payments from the [Funds] to the Woodward School."

assets in the Adams Fund was reportedly still the same: $321,932.43.

The assets of the Charles Francis Adams Fund, which are far smaller than those of the Adams Fund, have diminished somewhat over time. As of 1953, the Fund had a value of $23,428, consisting of $1,453 in cash and $21,975 in securities (primarily in corporate bonds). It has since declined to $19,982 as of 2005, when it consisted of $2,530 in cash and $17,452 in investments.[8]

Despite the lack of growth in the Funds, between 1953 and 2008, the Funds generated over $700,000 in income; this income was either paid to Woodward directly or used to pay the Funds' expenses.

2. Request for accounting and present litigation. The present dispute began in 2005, when Woodward had, for two consecutive years, received a smaller distribution from the Funds than it had anticipated. In light of these discrepancies, the chair of the Woodward board of trustees requested an accounting of the Funds from Quincy. As of nearly one and one-half years later, the school had received some information from

---

[8] As of 1962, the Charles Francis Adams Fund had a value of $24,323. The Fund hovered in this range until 1977, when it dropped to $19,542. As of 1984, the Fund contained $21,975.

Quincy but not a full accounting, which it again requested.[9]  In July, 2007, after still receiving no response, Woodward filed a complaint and petition for an accounting with a single justice of this court against Quincy as trustee of the Funds.  Woodward asserted that "as beneficiary of the Funds, [it] is entitled to know, the real and financial assets currently in the Funds, information about the Funds' management, and historically what has happened to the Funds' assets and income."  The single justice transferred the case to the Norfolk County Division of the Probate and Family Court Department.

A judge in that court appointed a special master to gather relevant documents regarding the Funds' assets, prepare an accounting for the Funds for the period of 1953 to 2008, inclusive, and issue a report assessing the propriety of the Funds' transactions.  See G. L. c. 206, § 2; Rule 20 of the Rules of the Probate and Family Court, Massachusetts Rules of Court, at 1051 (Thomson Reuters 2014).  Overall, the special master concluded that Quincy had committed a breach of its fiduciary duties in several respects, primarily because it had "not maintained adequate books and records to substantiate its

---

[9] Quincy had never previously provided an accounting of its stewardship of the Funds to Woodward.

stewardship as Trustee," and it had sold the Funds' real property at less than fair market value.[10,11]

---

[10] This accounting and report was supplemented by that of a certified public accountant, who was retained to assist the special master. Incorporating the accountant's findings, the special master made numerous findings, the most relevant of which are summarized here. First, he determined that the return generated by the Funds' investments was "comparable to the market return of similar investments." Second, he concluded that $85,090 in income from the Adams Fund that was not distributed to Woodward "was maintained in the Fund and reinvested in market rate instruments," and that $18,864 in income from the Charles Francis Adams Fund was wrongly withheld from Woodward. Third, he concluded that real property sales conducted between 1953 and 1972 were below fair market value, and that the only remaining parcel of real property held by the Funds was leased at less than fair market rent. Fourth, he determined that Quincy's expenses were significant and required justification. Finally, the special master concluded that Quincy committed a breach of its duty of care to Woodward and "may have violated its duty to prudently invest trust assets" with regard to the land sales between 1955 and 1972; committed a breach of "its duty of loyalty to Woodward when it engaged in business dealings which caused trust property to be sold for below fair market value"; committed a breach of its duty to furnish information to beneficiaries "by not informing Woodward of the 1972 petition concerning the lease" of real property owned by the Funds, which was not a prudent investment, and by not providing an actual accounting when Woodward requested one until ordered to do so by the court; and committed a breach of its duty to keep accurate records and provide reports. In a supplemental report filed after receipt of additional documentation, the special master concluded that Quincy "did not adhere to the investment mandates" articulated in Deed A and "varied the investment portfolio between equities and bonds" when the deed seemed to limit investments to bonds only. The special master also noted that the fifty-five year accounting period at issue exceeded the recommended record retention period and therefore questioned the timeliness of Woodward's challenge to Quincy's actions as trustee.

[11] The trial judge subsequently gave "presumptive weight" to the special master's findings and conclusions. See Mass. R. Civ. P. 53 (h) (1), as amended, 386 Mass. 1237 (1982).

Following the report of the special master, the dispute proceeded to a thirteen-day bench trial. In February, 2011, an amended judgment and amended findings entered, with 220 findings of fact.

The judge concluded that Quincy failed to keep accurate records of its financial stewardship of the Funds, to obtain appraisals for real property and to sell parcels at fair market value or greater,[12] to act on professional investment advice it received, and to comport with its duty of loyalty to the Funds. The judge characterized Quincy's management of the Adams Fund specifically as "inattentive, imprudent and neglectful," but not so neglectful as to "rise to the level of gross corruption or gross mismanagement," such that the remainder beneficiary would take the trust property.

With regard to Quincy's investment strategy for the Adams Fund, the judge made several findings relevant to Quincy's appeal.[13] First, he concluded that Quincy did not commit a

---

[12] With regard to Quincy's real estate sales on behalf of the Adams Fund, the judge concluded that Quincy failed to fulfil its duty to sell realty for the best possible price, or at least for fair market value, and instead prioritized its own municipal needs.

[13] With regard to the investment strategy for the Charles Francis Adams Fund, the judge concluded that even though the Fund's corpus had declined by nearly fifteen per cent between 1953 and 2005, it appeared that Quincy had made "a modest effort to pay income of this relatively basic trust over to the

breach of its fiduciary duty to the Funds by employing inappropriate investment strategies during the years of 1953 to 1973.[14]  Second, with regard to the 1973 investment advice Quincy received from the bank, the judge found that Quincy received and unanimously voted to adopt a single portfolio diversification plan, consisting of sixty per cent in equity securities, thirty-five per cent in fixed income, and five per cent in savings (60-35-5 plan).  He concluded that Quincy failed to follow this directive, and that it "ignored the terms of its own April 11, 1973, vote, and the competent, professional . . . advice contained therein, to the considerable detriment of the [Adams Fund]."  Therefore, Quincy acted imprudently and in violation of its fiduciary duties.

Third, the judge found that it was imprudent for Quincy to permit the Adams Fund to consist almost entirely of fixed income and cash assets by 1990.  The judge rejected Quincy's assertion that it maintained the Fund's assets in government securities in order to comport with the explicit directive of the trust instrument; rather, the judge concluded that the Fund had acted in derogation of the 1892 legislation directing Quincy to invest

---

Woodward School."  The judge therefore declined to speculate as to any loss in income received by Woodward from this Fund.

[14] Nonetheless, the judge expressed "serious reservations and concerns" regarding the investment approach employed during this period.

real estate sales proceeds "in real estate or in . . . securities," by instead investing "the fungible portion of the trust corpus in corporate bonds as well as in equities/securities."[15]

In light of these findings, the judge awarded Woodward a total judgment of $2,994,868, including prejudgment interest of $1,610,826 and approximately $1.1 million for "[u]nrealized [g]ains in portfolio," and removed Quincy as trustee of the Funds.[16]

---

[15] This finding departed from the special master's finding on this issue.

[16] The $2,994,868 total judgment was calculated as follows: $255,566 in miscellaneous damages due to financial mismanagement, including recoupment of funds not received by the Adams Fund as a result of sales of real estate below fair market value, unrealized income from the sale of a particular parcel, the value of "missing" funds from the South Shore National Bank (bank) account where the trust assets were held and from unreported stock gains, and recoupment of an unexplained account deficiency; $1,135,494 for the unrealized gain in the investment portfolio; and a total of $1,610,826 in prejudgment interest on these items ($475,426 on the miscellaneous damages combined, and $1,135,400 on the unrealized gains); less a credit for disallowed expenses of $7,018. Quincy's argument on appeal focuses primarily on the unrealized gains and the prejudgment interest portions of the award of damages. It appears to concede that if the Massachusetts Tort Claims Act, G. L. c. 258, §§ 1 et seq., does not bar the award, Quincy would remain responsible for $119,271 of the $255,566 miscellaneous damages (the amount attributable to unrealized income from the sale of a particular parcel and the unexplained account deficiency), plus certain prejudgment interest on that amount. Quincy asserts that the remainder of the $255,566 (attributable to below-market real estate sales and missing accounts and gains) is barred by laches.

Discussion. We will not disturb the findings of the trial judge or the special master unless they are clearly erroneous. Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996). See Chase v. Pevear, 383 Mass. 350, 359-360 (1981); Matter of Jones, 379 Mass. 826, 839 (1980). "A finding [of fact] is clearly erroneous . . . [if], although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotations and citations omitted). Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 509 (1997).

1. Breach of fiduciary duties. The primary issue in this case is whether the judge erred in concluding that Quincy committed a breach of its fiduciary duties by failing to invest in growth securities and by failing to heed investment advice it procured from an investment adviser. Because trustees' conduct with regard to investment strategy and decision-making is governed by the prudent investor standard, we begin by articulating what that standard requires.

a. Prudent investor standard. A trustee's obligations with regard to investing and managing a trust's assets are dictated by our common law and by the Massachusetts Prudent Investor Act, G. L. c. 203C, §§ 1 et seq. See Kimball v.

Whitney, 233 Mass. 321, 331 (1919); Harvard College v. Amory, 9 Pick. 446, 461 (1830).[17]

A trustee has a duty to invest the trust's assets "solely in the interest of the beneficiaries." G. L. c. 203C, § 6. In performing this duty, a trustee must "exercise reasonable care, skill, and caution" in "invest[ing] and manag[ing] trust assets as a prudent investor would, considering the purposes, terms, and other circumstances of the trust." Id. at § 3 (a). Among those considerations are "the possible effect of inflation or deflation"; "the expected total return from income and the appreciation of capital"; "other resources of the beneficiaries"; and "needs for liquidity, regularity of income, and preservation or appreciation of capital." Id. at § 3 (c) (2), (5)-(7). See O'Brien v. Dwight, 363 Mass. 256,

---

[17] Because the Massachusetts Prudent Investor Act, G. L. c. 203C, §§ 1 et seq. (Act), applies only "to decisions or actions of a trustee occurring on or after" the 1998 effective date of the Act, we apply the standards of both the common law and the Act and note distinctions where relevant. See St. 1998, c. 398, § 3, inserting G. L. c. 203C. In many respects, the Act mirrors the common-law doctrine that has existed since the mid-1800s. See Harvard College v. Amory, 9 Pick. 446, 461 (1830). See also Chase v. Pevear, 383 Mass. 350, 363 (1981). However, the Act introduced two significant changes: permissive delegation of duties, and the modern portfolio theory, which recognizes inflation as a factor to be considered in portfolio management decision-making and therefore shifts the assessment of a trustee's actions to the over-all construction of the portfolio. See Taylor, Massachusetts' Influence in Shaping the Prudent Investor Rule for Trusts, 78 Mass. L. Rev. 51, 51-52 & n.5 (1993). Compare Chase, supra at 364 (assessing each investment individually, but with some consideration of "the fund as a whole" [citation omitted]).

294-295 (1973).  We assess investment decisions in the context of the over-all investment strategy of the trust.[18]  G. L. c. 203C, § 3 (b).  See Restatement (Third) of Trusts § 90 (2007).

A trustee exercising "reasonable care, skill and caution," G. L. c. 203C, § 3 (a), undoubtedly will approach investment decisions with some conservatism.  This, however, must be balanced with a degree of risk in order to obtain income for the trust and protect the principal against inflation.  See Restatement (Third) of Trusts, supra at § 90 comment e; Restatement (Second) of Trusts § 227 comment e (1959). Diversification of investments is therefore considered a central component of prudent investment because it both moderates and reduces risks.  See G. L. c. 203C, § 4; Chase, 383 Mass. at 363. Accordingly, trustees are discouraged from investing "a disproportionately large part of the trust estate in a particular security or type of security."  Restatement (Second) of Trusts, supra at § 228 comment a.  Nonetheless, the standard recognizes that in some circumstances, it may not be prudent to diversify an investment portfolio, particularly where "the objectives of both prudent risk management and impartiality can be satisfied" without diversification.  Restatement (Third) of

---

[18] For actions occurring prior to 1998, we evaluate each investment individually, but also consider investments in the context of the trust as a whole.  See Chase, 383 Mass. at 364.

Trusts, <u>supra</u> at § 90 comment g.  See G. L. c. 203C, § 4; Restatement (Second) of Trusts, <u>supra</u>.

b.  <u>Investment advice</u>.  We turn now to Quincy's first claim of error.  Quincy contends that the judge erred in concluding that Quincy was required to follow specific investment advice it requested and received in 1973.  In addition, it asserts that the judge misconstrued the investment advice at issue as providing only one recommendation, when the advice actually consisted of several alternatives, one of which Quincy claims to have followed.  We agree that the judge improperly considered strict compliance with investment advice to be required of a prudent investor.  We do not, however, consider the judge's interpretation of the advice provided to be clearly erroneous.

The investment advice in dispute was provided by the bank in a letter dated March 29, 1973, and reviewed by the joint boards of the Funds at a meeting on April 11.[19]  The letter was interpreted by the trial judge as providing a single diversification recommendation of sixty per cent equity securities, thirty-five per cent fixed income, and five per cent savings (60-35-5 plan).[20]  This represented a drastic change from

_____

[19] Quincy had requested this advice after receiving guidance from its legal counsel that it was permissible to seek professional advice regarding investments, but that Quincy would retain responsibility for making investment decisions.

the Adams Fund's portfolio at the time of ninety per cent fixed income and ten per cent equity securities. On receiving the investment advice, the joint boards unanimously voted to enter into an advisory relationship with the bank,[21] and to "mak[e] investments and changes of investments in said Funds substantially within the outline as presented" by the bank in its letter.[22] However, Quincy did not make changes to its

---

[20] The letter lends itself to several interpretations. It ambiguously refers to three proposals, giving some credence to Quincy's suggestion that the letter did not provide only one directive. We agree with Quincy that one of the proposals included in the letter was for "a modest upgrading of the balance of the bond portfolio into higher rate bonds," which Quincy purports to have followed. However, we are not persuaded that the recommendations contained in the letter were meant to be alternatives rather than complements to each other. Our own review of the letter suggests that the primary emphasis with regard to the Adams Fund was the adoption of a diversification plan consisting of sixty per cent in equity securities, thirty-five per cent in fixed income, and five per cent in savings (60-35-5 plan). Accordingly, the judge's understanding of the letter as providing this recommendation is plausible and not clearly erroneous.

[21] The agreement authorized the bank "to review periodically and to advise or recommend to [Quincy] the retention, sale or exchange of the securities and other property in the [Funds] and to advise or recommend the purchase of stocks, bonds and other securities." The agreement indicated that Quincy would ultimately be responsible for making decisions regarding "the acquisition or disposition of securities and other property."

[22] The trial judge found that the boards adopted the specific 60-35-5 diversification proposal discussed above. However, the meeting minutes do not reflect such a precise vote. Accordingly, we conclude that the boards did not adopt any specific reading of the investment advice provided in the letter but rather resolved to follow more generally the advice provided.

portfolio consistent with the advice it received, and instead increased the percentage of investments in fixed income assets so that, by 1990, nearly one hundred per cent of the assets of the Adams Fund were in fixed income investments.[23]

Under both the common law and the Prudent Investor Act, a trustee is permitted to consult with and receive advice from accountants and financial advisers. See G. L. c. 203C, § 10 (a); Milbank v. J.C. Littlefield, Inc., 310 Mass. 55, 62 (1941) ("A trustee may avail himself of the services of others"); Restatement (Third) of Trusts, supra at § 77 comment b & § 80 comment b. Cf. Rothwell v. Rothwell, 283 Mass. 563, 571 (1933) (trust disbursements paying agents and attorneys who assisted in trust management were appropriate); Hanscom v. Malden & Melrose Gas Light Co., 234 Mass. 374, 381 (1920) (same).

Indeed, consulting investment advisers may be part of acting prudently and exercising care. See Restatement (Third) of Trusts, supra at § 77 comment b. "After obtaining advice or consultation, the trustee can properly take the information or suggestions into account but then (unlike delegation) must exercise independent, prudent, and impartial fiduciary judgment

---

[23] Although Quincy avers that it followed some of the advice in the letter by upgrading the Adams Fund's bond portfolio to higher rate bonds, as noted above we are not persuaded that this was more than a secondary component of the bank's broader diversification recommendation.

on the matters involved." Id. at § 80 comment b. See Attorney Gen. v. Olson, 346 Mass. 190, 197 (1963) (trustee may employ bank as investment agent, as long as trustee gives independent consideration to agent's recommendation). In contrast, were we to require a trustee to follow investment advice it receives, we would in effect mandate delegation of a trustee's fiduciary duties.[24] We decline to require a trustee to abdicate this fundamental function of a trustee to make investment decisions merely because the trustee seeks advice on acting prudently. See Boston v. Curley, 279 Mass. 549, 562 (1931). However prudent the advice may be, a trustee is not required to follow it. To the extent the judge considered the failure to follow specific advice a per se breach of Quincy's fiduciary duty of prudent investment, this was in error.

Whether a trustee requested and followed specific investment advice is but one factor in the determination of whether the trustee acted prudently. Receipt of sound investment advice and dismissal or wilful ignorance of it, where the advice was at the time prudent and consistent with the trust

---

[24] The common law and the Prudent Investor Act take different approaches to delegation of a trustee's responsibilities. Compare G. L. c. 203C, § 10 (a) (permitting trustee to "delegate investment and management functions if it is prudent to do so"), with Milbank v. J.C. Littlefield, Inc., 310 Mass. 55, 62 (1941) (trustee may not "delegate his authority as trustee"), and Boston v. Curley, 276 Mass. 549, 562 (1931). Merely receiving, considering, and adopting investment advice, however, does not constitute delegation under either standard.

beneficiary's needs and goals, may be indicative of a lack of prudent investing. But such action or inaction in and of itself does not rise to the level of imprudent investing. The judge's reliance on the 1973 investment advice as a default prudent investment strategy resulted in inadequate consideration of the range of investment strategies that would have been prudent for the Adams Fund.[25]

c. <u>Concern for principal of income-only fund</u>. Quincy also challenges the trial judge's finding that it committed a breach of its fiduciary duty by not investing in growth securities. It asserts that as the trustee of a fund with only an income beneficiary, it had a "duty to maximize income, even at the risk of sacrificing growth," and therefore it was not obligated to invest in growth equities that would protect the principal from inflation. It claims that it acted prudently in structuring the Adams Fund's investment portfolio as it did because the Fund produced income for Woodward, and the investments comported with the trust instrument's direction to invest the majority of the Fund's assets in government-backed bonds.

The judge's findings regarding the Adams Fund's investment portfolio demonstrate that the Fund has been primarily invested

---

[25] We reserve our discussion of the impact of Quincy's failure to follow the bank's investment advice for a more holistic analysis of whether it acted prudently. See part 1.d, <u>infra</u>.

in fixed income assets since Woodward became the income beneficiary.  As a result, the value of the Fund has remained largely unchanged since 1973.  Despite this lack of principal growth, between 1973 and 2008, the Funds generated over $700,000 in income, benefiting from a 7.54 per cent rate of annual return, which was either paid to Woodward directly or used to pay the Funds' expenses.  Nonetheless, the judge found that it was imprudent for Quincy "to permit, by 1990, the [Adams Fund] to consist of essentially 100% fixed income/cash assets," and that this imprudence significantly harmed the Adams Fund.

Where, as here, the current beneficiary of a trust is an income-only beneficiary, courts in at least three other jurisdictions with similar prudent investor standards have concluded that a trustee owes a duty to that beneficiary to prioritize income over growth, and that investing in fixed income assets over equities is not a breach of fiduciary duty where such investments produce income for the beneficiary but may fail to maintain the principal against inflation.  See Tovrea v. Nolan, 178 Ariz. 485, 490 (Ct. App. 1993); SunTrust Bank v. Merritt, 272 Ga. App. 485, 488-489 (2005); In re Trust Created by Martin, 266 Neb. 353, 359-360 (2003).  See also Shirk v. Walker, 298 Mass. 251, 257-258 (1937).  This comports with the obligation under G. L. c. 203C, § 6, to invest for the benefit of the beneficiaries.

Although trustees in such cases are required to balance the interests of successive beneficiaries, one of whom is to receive the income during his or her lifetime and the other of whom is to take the principal on the income beneficiary's death, these courts have consistently concluded that a trustee does not commit a breach of a fiduciary duty "by investing the trust in such manner as to maximize the income payable to [the income beneficiary] rather than expand the corpus of the trust." SunTrust Bank, 272 Ga. App. at 489.  See Tovrea, 178 Ariz. at 490 ("trustees' duty was [primarily] to invest in such a manner as to produce an income for [income beneficiary] and, secondarily, [to] preserve the principal").

In theory, the case for maximizing income over growth is even stronger here, because the income beneficiary is an institution and the remainder beneficiary takes only upon "gross corruption or mismanagement . . . notorious negligence, or any waste knowingly permitted," thereby justifying complete attention to the interests of Woodward.  See G. L. c. 203C, § 6. However, the Adams Fund's status as a charitable trust and Woodward's institutional status makes this case distinctly different from those involving trusts with a lifetime beneficiary.

A charitable trust such as this one is designed to support an income beneficiary in perpetuity.  See Jackson v. Phillips,

14 Allen 539, 550 (1867) (charitable trusts exempt from rule against perpetuities). As a result, the trustee must necessarily consider both the generation of income <u>and</u> the growth and maintenance of the principal in order to provide income funds to the beneficiary indefinitely. See Restatement (Third) of Trusts, <u>supra</u> at § 90 comment e ("In balancing the return objectives between flow of income and growth of principal," trustee must consider trust's "purposes and distribution requirements"). In effect, Woodward is equivalent to both the lifetime income beneficiary and all subsequent beneficiaries.

As such, acting prudently in managing a charitable trust that benefits an institutional income beneficiary requires considering the specific needs of the beneficiary in the short and long term and balancing prioritization of income with protection and preservation of the principal. At a minimum, a trustee must consider how best to guard the principal against inflation, if not how to grow the principal while simultaneously generating income to support the beneficiary. Where the income beneficiary will continue to exist in perpetuity, the mandate of G. L. c. 203C, § 3 (<u>a</u>), to act with "caution" necessarily entails considering "the possible effect of inflation or deflation," <u>id</u>. at § 3 (<u>c</u>) (2), and the "preservation or appreciation of capital," <u>id</u>. at § 3 (<u>c</u>) (7). A trustee must

accordingly "invest with a view both to safety" -- "seeking to avoid or reduce loss of the trust estate's purchasing power as a result of inflation" -- and "to securing a reasonable return." Restatement (Third) of Trusts, supra at § 90 comment e.

In this case, a prudent investor would have realized at some point, long before 2008, that a fund value that is unchanged for decades after 1953 has not kept up with inflation, and, given the potential perpetuity of the income beneficiary's needs, would have taken or attempted to take steps to protect the principal in order to preserve future income opportunities. If Quincy recognized that the Adams Fund was vulnerable to inflation, likely attributable to its lack of diversification, it had a duty to determine which of its assets could be invested in a manner that would guard against this vulnerability. At a minimum, Quincy could have invested the proceeds from the sale of real estate in investments that would potentially protect the principal. See St. 1898, c. 102. Instead, Quincy chose to keep the Adams Fund's investment assets exclusively in bonds, which produced a higher rate of return than a more diversified portfolio but resulted in stagnation of the trust principal.[26]

---

[26] Quincy asserts that the terms of the trust instrument, Deed A, required it to invest most of the principal, with the exception of real property sales proceeds, in State and Federal bonds. Under the Prudent Investor Act, a trustee may be relieved from the obligations set forth in the Act where the trust instrument requires the trustee to act otherwise and "the

Where, in most instances, an increase in principal will lead to an increase in income, this decision not to diversify was imprudent in light of the Adams Fund's need to support Woodward in perpetuity and not merely during a human lifetime. Even without the benefit of hindsight, see G. L. c. 203C, § 9, it is clear that Quincy did not take any steps to protect the Adams Fund's principal against inflation. We therefore conclude that Quincy's failure to protect the principal against inflation alone was sufficient to constitute a breach of its fiduciary duty.

---

trustee acted in reasonable reliance on the provisions of the trust." G. L. c. 203C, § 2 (b). See Restatement (Second) of Trusts § 228 comment f (1959) ("By the terms of the trust the requirement of diversification may be dispensed with"). However, we are not persuaded that Quincy's complete reliance on this particularly restrictive trust provision was reasonable. Quincy failed to keep adequate records reflecting which assets could be invested only in bonds and which assets could be more broadly invested and used to diversify the portfolio and secure the principal against inflation. Instead, Quincy invested nearly all of its assets in bonds, which undoubtedly exceeded the allocation that was required by the trust.

Further, if the express terms of the trust proved too restrictive to achieve the trust's goals, Quincy could have appealed to the court to revise the trust's terms to better serve its original purpose. See Trustees of Dartmouth College v. Quincy, 357 Mass. 521, 531 (1970) ("courts of equity" have general power "in the administration of charitable trusts to permit deviations short of cy pres applications"); Briggs v. Merchants Nat'l Bank of Boston, 323 Mass. 261, 274-275 (1948) (applying cy pres doctrine because "[equity] will presume that the donor would attach so much more importance to the object of the gift than to the mechanism by which he intended to accomplish it that he would prefer to alter the mechanism to the extent necessary to save the object").

d. Quincy's over-all performance. As the above discussions illustrate, Quincy engaged in several shortcomings in its management of the Adams Fund's investment portfolio that indicate that it failed to perform as a prudent investor would under the circumstances. See G. L. c. 203C, § 3 (a). Although Quincy sought and received ongoing investment advice from the bank in 1973 and thereafter,[27] it does not appear that it ever heeded the most significant, and seemingly prudent, advice the bank provided, construed in even the most general terms:  to diversify the Adams Fund's portfolio in such a way that would decrease slightly the annual rate of return but would realize some appreciation for the principal.  This factor, while not dispositive, is illustrative of Quincy's general lack of consideration of diversification, long considered a prudent investment strategy, see G. L. c. 203C, § 4; Chase, 383 Mass. at 363, and its disregard for both the 1898 legislative directive and the long-term needs of the income beneficiary.

We are not persuaded that Quincy was prohibited from following this advice or from otherwise diversifying the Adams Fund's portfolio by the restrictions in the trust instrument. See note 26, supra.  Rather, as Quincy's legal counsel observed

_____

[27] The board meeting minutes reflect that an investment representative from the bank attended the board meetings and provided reports to Quincy in the decades following the 1973 advice.

and as the 1898 Act required, Quincy was in fact directed to invest the real estate sale proceeds "in real estate or in such securities as trustees are authorized to hold in this Commonwealth." St. 1898, c. 102, § 2. The limitation articulated in Deed A of investing in government-issued bonds did not apply to these proceeds. Thus, contrary to Quincy's assertion that it was following the restrictions on the investment of the Adams Fund, its nearly complete investment in bonds suggests that Quincy actually contravened the applicable investment restrictions.

Finally, and most significantly, Quincy failed to invest with the long-term needs and best interests of the income beneficiary in mind, creating a portfolio that consistently provided income but that left the principal vulnerable to inflation and, as a result, depreciation. See Harvard College, 9 Pick. at 458. Accordingly, based on these considerations, the judge's ruling that Quincy committed a breach of its fiduciary duty of prudent investment was not clearly erroneous.

2. Award of damages. We turn next to Quincy's allegations of error in the theory and calculation of the award of damages.

a. Theory of damages. Quincy contends that the judge improperly devised a new liability theory, that of Quincy's failure to achieve any capital appreciation for the Adams Fund, that had not previously been an issue in the case. Quincy avers

that by "injecting" this issue into the case, enabling Woodward to assert the issue by permitting its expert witness to testify based on the theory, and making a finding based on this testimony, the judge engaged in an inappropriate fact-finding method and denied Quincy an adequate opportunity to prepare to defend against the theory.  We agree with Woodward that the issue of lack of capital appreciation was present from the beginning of the litigation, and further note that even if it were not, a judge has the authority to raise an issue in the case as long as adequate notice is afforded to the parties.

We begin with a brief description of what transpired.  On the second day of trial, in the presence of counsel, the judge indicated his disbelief that the Adams Fund's principal would not have grown significantly over the course of nearly sixty years.[28]  He then proceeded to ask counsel a number of rhetorical but relevant questions about why the value of the Adams Fund had not appreciated, speculating that perhaps various stock

---

[28] Specifically, the judge stated, "It is inconceivable to me that the value of the portfolio has not doubled, tripled, quadrupled over [sixty] years."  He observed that there had been no growth in the Adams Fund's portfolio but that "[t]he investments seemed reasonable" and "didn't seem inappropriate." In encouraging the parties to seek a settlement, the judge noted that he had "no idea what the end result of this case [was] going to be" and that it was "unusual that a trust fund, whereby there would be no invasion of the principal, doesn't grow over [sixty] years of an incredible period of time of growth in the country. . . . It is inconceivable that there would not be an increase."

investments had been made that did, at least temporarily, lead to some appreciation, the value of which was then lost through unsuccessful investments, but that such transactions were simply not reflected in the Fund's records. Quincy asserts that these statements "injected" the issue of capital appreciation into the case.

Thereafter, Woodward identified Scott Winslow as an expert witness who would testify that the Adams Fund's investment portfolio, being primarily invested in bonds, was such that it resulted in significant underperformance. Quincy moved to exclude Winslow's testimony, asserting that it "would introduce a new issue in the middle of trial." In opposition, Woodward contended that Winslow's testimony would "respond to the Court's questions regarding why it was that despite a period of extraordinary growth in the economy, the principal of [the Funds] did not increase in value." Woodward further asserted that capital appreciation had been an issue from the beginning. The judge denied the motion but ultimately limited Winslow's testimony on this issue to whether the investments were consistent with the advice Quincy had received from the bank, and prohibited Winslow from testifying about a theoretical proposal that Quincy could have followed.

Winslow testified that, had Quincy employed the 60-35-5 diversification plan recommended by the bank in 1973, the Adams

Fund would have grown in value significantly.  Because Quincy did not do so, the Fund's value remained unchanged from 1973 to 2008.  The judge credited this testimony and used it to calculate the damages owed to Woodward.

Although the specific calculations employed by Winslow and adopted by the judge were inappropriate for the award of damages, as we discuss infra, there was no error in the process by which this liability theory was introduced.  The question of capital appreciation was indeed mentioned in Woodward's complaint, in the order appointing a special master, and in Woodward's pretrial memorandum.  Given this early introduction of the issue, we are not persuaded that Quincy was denied a meaningful opportunity to prepare to defend against this assertion.  Contrast Harrington-McGill v. Old Mother Hubbard Dog Food Co., 22 Mass. App. Ct. 966, 968 (1986).

Even if the issue were not raised in the complaint and other documents, the judge may introduce a recovery theory or unpleaded issue at trial if there is "implied consent" of the parties, reflected by evidence "that the parties knew the evidence bearing on the unpleaded issue was in fact aimed at that issue and not some other issue the case involved."  Jensen v. Daniels, 57 Mass. App. Ct. 811, 816 (2003).  See Mass. R. Civ. P. 15 (b), 365 Mass. 761 (1974); Harrington-McGill, 22 Mass. App. Ct. at 968.  As the above discussion

regarding Quincy's breach of fiduciary duty evinces, the question whether a trust's principal has experienced any capital appreciation is part of the inquiry into whether a trustee has engaged in prudent investments. Accordingly, Quincy cannot claim that, where a breach of fiduciary duty was alleged for improper investment strategies, it was unaware that principal appreciation might be an issue or even unaware of the facts that might be used in support of an argument that there was no appreciation.

Further, in raising the theory, the judge afforded numerous opportunities for Quincy to respond. Quincy was permitted to depose Winslow prior to cross-examination and to retain an expert and prepare a response to Winslow's testimony, which it did. In addition, the judge limited Winslow's testimony on this issue. Thus, Quincy suffered no prejudice in the way the liability theory was introduced, see Cormier v. Grant, 14 Mass. App. Ct. 965, 965 (1982), and there was no issue of "fundamental fairness" in the inclusion of the theory at trial. See Jensen, 57 Mass. App. Ct. at 816.

b. Calculation of damages. Quincy also alleges that the judge erred in calculating the award of damages award in three respects: first, by basing the award for unrealized gains on what the value of the Adams Fund would have been had Quincy followed the specific investment advice the judge found that

Quincy received in 1973; second, in deciding not to subtract from the unrealized gains the costs and expenses Quincy theoretically would have incurred had it followed the diversification plan; and third, in awarding prejudgment interest dating back to the date of each breach.[29]  We agree that the formula used to calculate unrealized gains was inappropriate, but reject Quincy's other claims.

   i.  Basis for unrealized gains.  Quincy first asserts that the judge's finding that Quincy should have adopted a specific portfolio diversification plan recommended by the bank in 1973, and the judge's employment of this plan by way of Winslow's testimony to calculate the unrealized gains, was clearly erroneous.  We agree.

   In awarding damages, the judge concluded that the Adams Fund was "entitled to a return on monies it would have

_____

   [29] Quincy also asserts that the judge's findings were inadequate to support the award.  While we agree with Quincy that the judge is required to make subsidiary findings of fact in support of an award, see Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996), we are not persuaded that the judge did not adequately do so here.  See Willis v. Selectmen of Easton, 405 Mass. 159, 161-162 (1989) (judge need only "articulate the essential grounds for a decision" and demonstrate that he or she "has dealt fully and properly with all the issues").  Further, to the extent Quincy challenges the judge's crediting of the testimony of Scott Winslow generally, and his discrediting of the testimony of Quincy's expert witness, we note that the judge is entitled to credit any properly admitted expert testimony he or she deems credible, and that the judge here explicitly found that Winslow's opinion was credible.  See Delano Growers' Coop. Winery v. Supreme Wine Co., 393 Mass. 666, 682 (1985).

reasonably realized but for the imprudent actions of the Trustee." Because the judge determined that it was imprudent for Quincy to ignore the bank's investment advice, and interpreted this advice as providing a 60-35-5 diversification plan, the judge calculated the return the Adams Fund would have realized based on this recommended portfolio and the five per cent rate of return the bank anticipated that such a portfolio would receive. Using this information, Winslow had testified that, had Quincy employed this diversification plan, given the growth in the equity market between 1973 and 2008, the Adams Fund would have grown from its 1973 value of $321,932.43 to a value of $1,457,426 in 2008.[30] The judge therefore determined that the Fund suffered a loss in value of $1,135,494, or an average annual loss of income of $31,542, from Quincy's failure to act prudently and to employ the bank's portfolio recommendation. Accordingly, he included this amount, plus prejudgment interest, in the total award.

To the extent the damages here were based on the judge's finding that Quincy ignored the specific investment advice it received in 1973, the finding and calculation were in error.[31]

---

[30] Quincy takes issue with the bond indexes employed by Winslow in calculating these numbers. Because we conclude that the formula used to calculate the unrealized gains was inappropriate, we decline to assess whether the indexes Winslow used were appropriate here.

As discussed above, a trustee is not required to follow investment advice strictly but rather must invest prudently. See G. L. c. 203C, §§ 1 et seq. Therefore, an award of damages cannot be based solely on what the trust's investment portfolio performance would have been had the trustee complied with certain, specific advice. Such reliance on a potential investment portfolio necessarily and improperly employs the benefit of hindsight. See id. at § 9. Unfortunately, this is precisely the formula the trial judge employed here.

The award must be based on more than just the unheeded investment advice a trustee received, and should instead consider the totality of the circumstances as they would have informed prudent investment decisions over the relevant time period. See Quinton v. Galvin, 64 Mass. App. Ct. 792, 800 (2005) (judge must reach "approximate estimate of the plaintiffs' damages" in considering variety of factors). Cf. Bernier v. Bernier, 449 Mass. 774, 785 (2007) (valuation of business for purposes of divorce proceeding must not be

---

[31] We disagree with Woodward's assertion that it was proper for the judge to rely on Winslow's testimony in calculating the award where Quincy did not present any contrary methodology or challenge Winslow's calculations. Were the methodology employed by the judge sound, and simply not the approach most favorable to Quincy, we would uphold the judge's calculation. However, we cannot permit a judge's ruling to stand where it is clearly erroneous, as we conclude it is here. See Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996). See also Young Men's Christian Ass'n of Quincy v. Sandwich Water Dist., 16 Mass. App. Ct. 666, 672-673 (1983).

"materially at odds with the totality of the circumstances").
Factors to consider in this case include the state of the
relevant bond and equities markets when various investment
decisions were made, not just at one point in time decades ago;
the terms and limitations of the trust instrument; the specific
needs of the income beneficiary in the short and long term; and
any risk calculations that may have influenced the trustee's
decisions, including subsequent advice from the bank, the Funds'
financial advisor.  Cf. Black v. Parker Mfg. Co., 329 Mass. 105,
112, 116-117 (1952) (assessment of value of unique services
involves consideration of variety of tangible and intangible
factors).  As another factor, the judge may "take into account
his general knowledge of economic conditions during the period
of [the trustee's] transgressions." Quinton, supra.  These
factors can appropriately guide the judge's determination of
"what asset mix a prudent fiduciary would have maintained" for
the Adams Fund during the lengthy time frame at issue.  See
Meyer v. Berkshire Life Ins. Co., 250 F. Supp. 2d 544, 573 (D.
Md. 2003).

Because the judge here considered merely one possible
investment approach and did not account for these other factors,
we reverse the award for unrealized gains in the portfolio and
remand for further proceedings on this measure.  On remand, an
assessment of what a prudent investor would have done requires

expert testimony on the minimum level of growth equities that would have been prudent for an income-only fund, with consideration of the potential shifts over the lengthy period at issue.  A prudent investor may well have followed the 60-35-5 plan, or could have chosen a portfolio with a lower allocation to growth equities.  At a minimum, the record must be thoroughly developed and findings made regarding the range of prudent strategies, so that the award, particularly with regard to unrealized gains, is calculated with a fuller understanding of the minimum growth equities allocation in mind.[32]

   ii.  Accounting for costs and expenses.  Quincy also asserts that the judge erred in failing to subtract from the damages related to the return on investment the costs and expenses the Adams Fund would have incurred in realizing those investment gains.  See G. L. c. 203C, § 8 (trustee may incur "costs that are appropriate and reasonable in relation to the assets, the purpose of the trust, and the skills of the trustee").[33]

---

[32] Recalculating the unrealized gains on the portfolio also requires careful consideration of the extent of likely stock appreciation and the appropriate rate of return corresponding with the portfolio or portfolios on which the award is based.

[33] Although the judge did not exclude any costs or expenses from the calculation of the unrealized return on investments, he did exclude from the total award expenses that he found to be allowable, including reasonable compensation for Quincy's services, despite the fact that Quincy never submitted a bill

The plaintiff bears the burden "to introduce evidence proving its damages to a reasonable certainty."  See <u>Brewster Wallcovering Co</u>. v. <u>Blue Mountain Wallcoverings, Inc</u>., 68 Mass. App. Ct. 582, 609 (2007).  The theory or explanation for the damages requested need not be the soundest one; it need only "provide[] a sufficiently (if minimally) rational basis" for the award.  <u>Id</u>. at 611.  Cf. <u>Bernier</u>, 449 Mass. at 785.  Woodward met this burden by presenting Winslow's testimony.  There is no obligation on the part of the judge to decrease potential damages sua sponte because of costs or expenses not admitted in evidence.  In the absence of contrary testimony from Quincy regarding what its costs were or would have been had it implemented the investment strategy on which the award was based, the judge did not err in crediting the reasonable opinion proffered by Woodward's expert as to what costs and expenses a trustee using a hypothetical portfolio would have incurred.  Cf. <u>Bernier</u>, <u>supra</u>.

iii.  <u>Award of prejudgment interest</u>.  Finally, Quincy challenges the judge's award of interest on each measure of damages from the last date on which the damage was sustained,

---

for this compensation.  In fact, the judge found that Quincy would be due a credit against other funds owed to the Adams Fund of $7,018, given $157,025 in allowed expenses offset by $150,007 in disallowed expenses.  This credit was factored into the total award.

consistent with the judge's findings on these issues.[34]  Quincy

avers that the judge erred in including this prejudgment

interest because, in tort actions, such interest can be awarded

only from the date of the filing of the complaint, and not from

the date of the breach itself, pursuant to G. L. c. 231, § 6B.[35]

We conclude that G. L. c. 231, § 6B, does not apply here, and

affirm the awards of prejudgment interest.[36]

General Laws c. 231, § 6B, provides for the addition of

interest to the amount of damages awarded in an action involving

damage to property and other such tort actions, at a rate of

twelve per cent per year from the date of commencement of the

action.  The statute is intended "to compensate a damaged party

---

[34] For example, the judge found that 1962 was the year of
the Adams Fund's last sale of real estate below fair market
value, and thus he included interest from the end of 1962 on the
monies not received as a result of these below-market real
estate sales.  In addition, the judge found that the sale of a
property referred to as "Vigoda" should have occurred in 1972
but did not occur at all, and therefore he awarded interest from
January 1, 1972.  The judge employed two different rates of
return in calculating the prejudgment interest:  five per cent
for the unrealized gain in the investment portfolio, and 7.54
per cent for all other measures.

[35] Quincy also avers that prejudgment interest is barred in
claims against municipalities under the Massachusetts Tort
Claims Act.  See G. L. c. 258, § 2.  Because, as discussed
infra, we conclude that Quincy waived its sovereign immunity on
these claims and therefore that the Tort Claims Act does not
govern here, we decline to address this claim.

[36] However, the rate of return the judge employed for the
unrealized gain in the investment portfolio may require
reconsideration on remand, consistent with our discussion above
regarding the flaws in this particular analysis.

for the loss of use or the unlawful detention of money." McEvoy Travel Bur., Inc. v. Norton Co., 408 Mass. 704, 717 (1990), quoting Conway v. Electro Switch Corp., 402 Mass. 385, 390 (1988). The primary goal of this statutory interest award is not to make the aggrieved party whole, but rather "to compensate for the delay in the plaintiff's obtaining his money." See Bernier v. Boston Edison Co., 380 Mass. 372, 388 (1980). To achieve this goal, § 6B affords a standard return that the aggrieved party "would have had but for the other party's wrongdoing," regardless of what the theory of liability or underlying damages calculation is. See McEvoy, supra.

In contrast, "[w]hen a breach of trust occurs, the beneficiary of the trust is 'entitled to be put in the position he would have been in if no breach of fiduciary duty had been committed.'" Berish v. Bornstein, 437 Mass. 252, 270 (2002), quoting Fine v. Cohen, 35 Mass. App. Ct. 610, 616 (1993). Making the beneficiary whole, particularly where the breach stems from imprudent investment decisions having an impact on the growth of the trust's assets, may require awarding interest beginning from the time of the breach, such that the trust's assets resemble what they would have but for the breach. In such circumstances, the award of prejudgment interest is part and parcel of the award of damages itself, and is not compensation for the delay of litigation in the same sense as

interest awarded under G. L. c. 231, § 6B. Accordingly, it was not erroneous for the judge here to find that the Adams Fund was entitled to a return on monies that it would have reasonably realized but for Quincy's imprudent actions, and to award prejudgment interest stemming from the last date of breach in order to make the Adams Fund whole.[37]

3. Claimed bars to recovery. We discuss briefly Quincy's remaining assertion that Woodward's claims should have been barred on the grounds of sovereign immunity; the Massachusetts Tort Claims Act, G. L. c. 258, §§ 1 et seq.; and laches. We conclude that Woodward's claims were not so barred, and recovery against Quincy was proper.

a. Sovereign immunity and applicability of Tort Claims Act. Quincy first argues that because Woodward ultimately brought a breach of fiduciary duty claim, which sounds in tort, Woodward was obligated to follow the requirements of the Tort Claims Act or else Quincy, as a municipality, would be effectively protected against the claim by sovereign immunity. Further, Quincy avers that Woodward failed to satisfy the Tort

---

[37] There may be circumstances in which it is proper to apply G. L. c. 231, § 6B, to tort actions arising from the breach of a fiduciary duty of a trustee. See, e.g., Lattuca v. Robsham, 442 Mass. 205, 210 (2004). Where, however, the judge determines that an award of prejudgment interest is necessary to make the beneficiary whole, the additional award of interest under § 6B would be excessive and improper, as such an award is not punitive in nature. See McEvoy Travel Bur., Inc. v. Norton Co., 408 Mass. 704, 717 (1990).

Claims Act's presentment requirement specifically, and therefore its claim should have been barred.  See G. L. c. 258, § 4. Woodward, in contrast, asserts that its claim sounds in contract rather than tort, because Quincy's obligations to manage the Funds arose through a contractual relationship with President Adams, and therefore the Tort Claims Act does not place any conditions on its claim.  Alternatively, if its claim does sound in tort rather than contract, Woodward contends that Quincy's sovereign immunity is impliedly waived, due to Quincy's acceptance of the role of trustee and subsequent acts by the Legislature affirming this role, such that Woodward's claim properly survived.

In determining whether a claim arises in tort or contract, we look to "the essential nature of the plaintiff's claim." Hendrickson v. Sears, 365 Mass. 83, 85 (1974).  When Quincy accepted the responsibility to manage President Adams's property in trust, Quincy and President Adams entered into a contract, see Dunphy v. Commonwealth, 368 Mass. 376, 383 (1975), of which Woodward is an intended third-party beneficiary and therefore is entitled to enforce the contract's terms.  See Miller v. Mooney, 431 Mass. 57, 61-62 (2000); Anderson v. Fox Hill Village Homeowners Corp., 424 Mass. 365, 366-367 (1997), and cases cited.  However, although Woodward initiated this action seeking an accounting, a purely contractual claim, the case evolved into

an action for breach of fiduciary duty, a claim that sounds in tort, see Doe v. Harbor Schs., Inc., 446 Mass. 245, 254 (2006); Lattuca v. Robsham, 442 Mass. 205, 210, 213 (2004), and arises by operation of law rather than by contractual obligation.  See, e.g., G. L. c. 203C, §§ 1 et seq.  See also LeBlanc v. Logan Hilton Joint Venture, 463 Mass. 316, 328 (2012) ("Where a contractual relationship creates a duty of care to third parties, the duty rests in tort, not contract").  Accordingly, the present case is a tort action.  To the extent Woodward asks us to frame its claim as a contractual one, we decline to do so. See Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc., 396 Mass. 818, 823 (1986).

As Woodward's claim sounds in tort, Quincy asserts that the Tort Claims Act imposes numerous conditions that Woodward failed to fulfil.[38]  See G. L. c. 258, §§ 1 et seq.; Morrissey v. New England Deaconess Ass'n -- Abundant Life Communities, Inc., 458 Mass. 580, 587 (2010).  The purpose of the conditions imposed by the Tort Claims Act is to limit tort claims against municipalities in order to maintain effective government.  See id.; Vasys v. Metropolitan Dist. Comm'n, 387 Mass. 51, 57

---

[38] Among these is the requirement that the plaintiff present its claim to the executive officer of the municipality within two years of when the cause of action arises.  See G. L. c. 258, § 4; Richardson v. Dailey, 424 Mass. 258, 261-262 (1997).  The parties do not dispute that Woodward did not comply with this presentment requirement.  In addition, the Tort Claims Act places a $100,000 limit on damages.  G. L. c. 258, § 2.

(1982).  See also Whitney v. Worcester, 373 Mass. 208, 217

(1977).  Hence, G. L. c. 258, § 10, explicitly excludes certain

types of claims that the Legislature clearly decided must give

way to sovereign immunity.

Because the Tort Claims Act is in effect a mechanism for

both limiting and preserving sovereign immunity from certain

tort claims,[39] see Morrissey, 458 Mass. at 587, and cases cited,

its restrictions do not apply where a municipality has waived

sovereign immunity, and thereby implicitly waived the

protections afforded by the Tort Claims Act.  Sovereign immunity

may be waived expressly by statute or implicitly, where

"governmental liability is necessary to effectuate the

legislative purpose."  Todino v. Wellfleet, 448 Mass. 234, 238

(2007).  See Woodbridge v. Worcester State Hosp., 384 Mass. 38,

42 (1981), and cases cited.  We conclude that Quincy's sovereign

immunity is impliedly waived here.

First, when Quincy agreed to serve as trustee, it assumed

the fiduciary duties of that role, including the consequences

for not fulfilling these duties.  The policy purposes of

---

[39] Indeed, the Tort Claims Act replaced any prior common-law sovereign immunity doctrine with regard to tort claims and was designed to provide "a comprehensive and uniform regime of tort liability for public employers."  Morrissey v. New England Deaconess Ass'n -- Abundant Life Communities, Inc., 458 Mass. 580, 588 (2010), quoting Lafayette Place Assocs. v. Boston Redev. Auth., 427 Mass. 509, 534 (1998), cert. denied, 525 U.S. 1177 (1999).

sovereign immunity are not served where, as here, a municipality takes on a responsibility beyond its inherent or core government functions and therefore serves in a capacity that could just as easily be accomplished by a nongovernmental entity.  See Morrissey, 458 Mass. at 587.  See also Minton Constr. Corp. v. Commonwealth, 397 Mass. 879, 880 (1986) (where municipality has assumed certain obligations through contract, it has waived sovereign immunity against actions brought to enforce such obligations).  In essence, by choosing to accept the obligations of trusteeship, Quincy waived any sovereign immunity from claims arising from its duties as a trustee.

A trustee, regardless of whether it is a municipality, a corporation, or a private individual, is accountable to courts for its conduct in fulfilling, or committing a breach of, the fiduciary duties it owes.[40]  See Fox of Boylston St. Ltd. Partnership v. Mayor of Boston, 418 Mass. 816, 818 (1994). Unlike the statute at issue in Woodbridge, 384 Mass. at 42, 44-45, where we determined that sovereign immunity was not waived, the Prudent Investor Act creates "a formal system of actionable guaranties," id. at 42, and expects the same level of conduct from any trustee.  See G. L. c. 203C, §§ 1 et seq.  "[A] natural and ordinary reading" of the Prudent Investor Act indicates that

---

[40] Indeed, Quincy has sought court direction regarding the administration of the Funds previously, and therefore has subjected itself to court supervision on these matters.

where a municipality accepts the obligations of serving as a trustee, it will be held to the same standards and subject to the same penalties as any other trustee. See DeRoche v. Massachusetts Comm'n Against Discrimination, 447 Mass. 1, 14 (2006).

Several legislative acts specific to the Funds further signal that Quincy is liable for any breach of the trustee responsibilities it has assumed. The 1827 Act appointed the treasurer of Quincy as treasurer of the Adams Fund and authorized a board of supervisors and the selectmen of Quincy to execute President Adams's intentions. See St. 1827, c. 59. It further required the treasurer to "render an account of his doings, and exhibit a fair and regular statement of the property in his hands." St. 1827, c. 59, § 9. The 1898 Act authorized Quincy, as trustee, to sell and convey the Adams Fund's real property holdings, and in effect confirmed Quincy's legal responsibility to administer the Fund and invest its assets. See St. 1898, c. 102. In neither of these acts did the Legislature indicate that Quincy would be held to standards different from those applicable to other trustees.

To effectuate the purposes of these acts, we must consider sovereign immunity to be impliedly waived. The Legislature could not have intended to enable a municipality to serve as a trustee, by way of the Prudent Investor Act and the 1827 and

1898 Acts, and simultaneously relieve it of the fiduciary duties inherent in the role of a trustee. Reading Quincy's obligations otherwise would frustrate the general intent of the Prudent Investor Act that trustees further the interests of trust beneficiaries, by eliminating any recourse for mismanagement, and would be illogical in light of the specific acts of the Legislature empowering Quincy to take on such fiduciary responsibilities on behalf of the Funds. Accordingly, the Tort Claims Act cannot be read to limit tort liability where a municipality has agreed to serve as a trustee.[41]

b. Laches. Quincy also argues that the equitable doctrine of laches bars Woodward's claim. We agree with Woodward, the trial judge, and the special master that the claim is not barred on this ground.

Quincy avers that Woodward unduly delayed in bringing this action, and that this delay prejudiced Quincy because several of its key witnesses had died since the alleged breaches occurred. Quincy's primary contention on appeal is that the judge improperly required actual knowledge by Woodward of Quincy's

_____

[41] Because we conclude that Quincy waived the provisions of the Tort Claims Act, including its exceptions, we decline to address Quincy's claim that the Probate and Family Court lacked subject matter jurisdiction for the claim under G. L. c. 258, § 3.

For the same reason, we need not decide whether Quincy's assertion that it is immune from suit on this claim under G. L. c. 258, § 10 (b), is a valid one.

mismanagement of the Funds in order to satisfy the laches standard; instead, Quincy asserts that an opportunity to ascertain such facts is all that is required for a laches defense.

At trial, Quincy identified two occasions on which it asserted that Woodward had constructive knowledge of Quincy's failings as a trustee. First, Quincy suggested that Woodward knew of Quincy's inadequacies as early as the 1960s, when the headmistress of Woodward communicated to Quincy's primary record-keeper that she was disappointed that Quincy had sold at least one parcel owned by the Funds for less than fair market value. Second, Quincy alleged that as a result of litigation in the late 1980s between Woodward and Quincy regarding Quincy's mismanagement of the Woodward Fund, a separate trust, Woodward knew or should have known that Quincy was engaging in similar mismanagement of the Funds at issue here. Quincy contends on appeal that this constructive notice should have been adequate to satisfy the laches standard.

Both the special master and the trial judge rejected Quincy's laches claim because it had not established that Woodward had actual knowledge of Quincy's breach prior to its seeking of an accounting in 2005.[42] There is no flaw in the

---

[42] The trial judge specifically rejected Quincy's assertion that Woodward should have known of Quincy's mismanagement as a

legal analysis employed by the trial judge.  To establish a laches defense, the asserting party must establish both actual knowledge, see Lattuca, 442 Mass. at 213-214; Demoulas, 424 Mass. at 518-519; and prejudice.  See Stuck v. Schumm, 290 Mass. 159, 166 (1935); Stewart v. Finkelstone, 206 Mass. 28, 36 (1910).  "Constructive knowledge is insufficient," Lattuca, supra at 213, as is "[m]ere suspicion or mere knowledge that the fiduciary has acted improperly."  Doe, 446 Mass. at 255.  This requirement of actual knowledge "protects the beneficiary's legitimate expectation that the fiduciary will act with the utmost probity in all matters concerning the relationship."  Id.  Contrary to Quincy's implication, a plaintiff is not required to conduct "an independent investigation" to determine if a breach of fiduciary duty has occurred.  Demoulas, supra at 520.

We agree with the special master's characterization that although "[c]ommon sense would dictate that if Woodward knew [Quincy] was mismanaging the Woodward Fund . . . , [then Quincy was] engaging in the same practices with regards to the Adams Fund [,] . . . common sense and constructive notice are not the standards here."  As the special master and trial judge properly concluded, the laches standard simply was not satisfied.

_____

result of the Woodward Fund litigation and emphasized that the Funds were not parties to that litigation and therefore were not officially on notice of it.

Conclusion.  The further amended judgment of the Probate and Family Court, and the amended judgment incorporated therein, is affirmed as to liability.  We affirm the judge's award of damages in part, but remand the case to the Probate and Family Court for recalculation of the damages related to the unrealized investment gains, including prejudgment interest thereon, and for further proceedings consistent with this opinion.

So ordered.