NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11940


   JAMES R. DeGIACOMO, trustee,[1] vs.  CITY OF QUINCY & others.[2]



      Suffolk.     September 7, 2016. - November 15, 2016.

   Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
                        Budd, JJ.



Res Judicata.  Collateral Estoppel.  Judgment, Preclusive
     effect.  Trust, Charitable trust.  Contract, Lease of real
     estate, Rescission.  Real Property, Lease.  Fiduciary.
     Attorney General.




     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on February 19, 2014.

     The case was heard by Spina, J., on motions for summary
judgment.


     James R. DeGiacomo (Susan J. Baronoff with him) for the
plaintiff.
     James S. Timmins, City Solicitor, for city of Quincy.
     Barry S. Pollack (Phillip Rakhunov with him) for Quincy
Historical Society.


──────────────────

     [1] Of the Adams Temple and School Fund.

     [2] Quincy Historical Society; Attorney General, interested
party.

GANTS, C.J.  In 1971, the city of Quincy (Quincy), as trustee of the Adams Temple and School Fund (Adams Fund), filed a "bill of complaint" in equity asking a single justice of the Supreme Judicial Court to enter a decree authorizing it to execute a proposed fifty-year lease of the building and parking lot of the Adams Academy that it had negotiated with the Quincy Historical Society (Society).  The Attorney General was a defendant in that action, but the Woodward School for Girls, Inc. (Woodward School or School), which was the sole income beneficiary of the Adams Fund, was not.  In 1972, the single justice decreed that Quincy was authorized to execute the proposed lease.  The successor trustee of the Adams Fund now seeks rescission of that lease, as well as money damages and restitution, claiming that Quincy violated its fiduciary duty of loyalty by executing the lease approved by the single justice.

The issue presented on appeal is whether the successor trustee of the Adams Fund is precluded by res judicata from obtaining that relief.  The successor trustee contends that he should not be precluded because neither he nor the Woodward School was a party to the equity proceeding in 1972, and the School could not reasonably have intervened because it was not given notice of the proposed lease or the filing of the complaint.  Quincy and the Society contend that preclusion is appropriate because, where the Adams Fund is a public charitable

trust, the only necessary party to the equity proceeding was the Attorney General, who was in privity with the School based on a statutory responsibility under G. L. c. 12, § 8, to "prevent breaches of trust" in the administration of public charities. We conclude that the successor trustee is precluded by res judicata from prevailing on his challenge to the execution of the lease.

Background.  The Adams Fund arose from the 1822 deed of trust of former President John Adams, who deeded a portion of his estate to the benefit of Quincy and its residents. The history of the Fund is described in Woodward Sch. for Girls, Inc. v. Quincy, 469 Mass. 151, 154-155 (2014) (Woodward School), so we will recount here only those facts relevant to the disposition of this appeal.

In 1953, this court decreed in an unpublished order that the net income from the Adams Fund shall be paid "for the conduct, operation, maintenance, management, and advancement" of the Woodward School.  The Woodward School remains the sole income beneficiary of the Fund.

In 2007, the Woodward School filed a complaint and petition for an accounting with a single justice of this court, and the single justice transferred the case to the Norfolk County Division of the Probate and Family Court Department.  After the issuance of a report by a special master and a bench trial, the

judge in February, 2011, entered findings of fact and an "amended judgment and rationale," in which he concluded that Quincy had failed as trustee to manage the Adams Fund in a competent and prudent manner, and thus committed a breach of its "primary duty" to maximize the income of the trust. Among other relief, the judge removed Quincy as trustee and appointed the plaintiff as successor trustee.[3] The judge specifically found that Quincy had committed a breach of its "duty of loyalty to the Woodward School" when it petitioned the single justice for approval of a fifty-year lease of the Adams Academy to the Society for "nominal rent." The judge, however, did not order that any action be taken regarding the lease, apart from enjoining Quincy from negotiating any modification or extension of the lease before the successor trustee had assumed stewardship of the Adams Fund. We affirmed the amended judgment as to liability but remanded the case to the Probate and Family Court for recalculation of the damages. Id. at 180.

In February, 2014, the successor trustee filed a complaint against Quincy and the Society in the county court, invoking this court's equity authority under G. L. c. 214, § 1. The complaint alleged that Quincy violated its fiduciary duty to the

---

[3] The judge also ordered the city of Quincy (Quincy) to pay $2,994,868 to the Adams Temple and School Fund (Adams Fund) for its breach of fiduciary duty and directed Quincy to file an accounting for the Adams Fund for the period from January 1, 2009, until the successor counsel commenced his stewardship.

Woodward School by failing to notify the School of its intention to lease the Adams Academy and by leasing the property at a rental price below market, and sought rescission of the lease and money damages. The complaint also alleged that the Society knowingly participated in Quincy's breach of fiduciary duty and, therefore, was liable for restitution in the amount of its unjust enrichment.

The plaintiff successor trustee moved for partial summary judgment, claiming that he was entitled under the doctrine of issue preclusion to a declaration that Quincy had committed a breach of its fiduciary duty to the Woodward School with respect to the lease, as had been found by the judge. The defendants, Quincy and the Society, cross-moved for summary judgment, claiming, among other grounds, that they were entitled to judgment under the doctrine of res judicata because of the judgment of the single justice in 1972 authorizing the execution of the lease.

The single justice allowed the defendants' motions, denied the plaintiff's motion, and entered judgment on behalf of the defendants. The single justice concluded that "[t]he 1972 decree settles as a matter of res judicata the issue of whether [Quincy] breached its duty of loyalty in executing the lease with the Society. It did not." The single justice also concluded that, because the judge made a "mistake of law" in

finding that Quincy had committed a breach of its fiduciary duty of loyalty by petitioning this court for approval of the lease, the judge's finding "can have no effect in the nature of collateral estoppel for the current litigation." The successor trustee appealed from the judgment to the full court, contending that the single justice erred as a matter of law in concluding that the defendants were entitled to judgment under the doctrine of res judicata.[4] We review the single justice's disposition of a motion for summary judgment de novo. Miller v. Cotter, 448 Mass. 671, 676 (2007).

Discussion. The doctrine of res judicata is based on "[c]onsiderations of fairness and the requirements of efficient judicial administration," which "dictate that an opposing party in a particular action as well as the court is entitled to be free from attempts to relitigate the same claim." Wright Mach. Corp. v. Seaman-Andwall Corp., 364 Mass. 683, 688 (1974). See Biggio v. Magee, 272 Mass. 185, 188 (1930) ("the doctrine of res judicata is a rule of public policy founded on the established principle that it is in the interest of the parties and for the public welfare that litigation once decided on its merits should end").

---

[4] The successor trustee does not challenge on appeal the single justice's denial of his motion for partial summary judgment.

Res judicata is now understood as a "generic term" that describes two specific types of preclusion. Heacock v. Heacock, 402 Mass. 21, 23 n.2 (1988). "Claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and prevents relitigation of all matters that were or could have been adjudicated in the action." Kobrin v. Board of Registration in Med., 444 Mass. 837, 843 (2005), quoting O'Neill v. City Manager of Cambridge, 428 Mass. 257, 259 (1998). "[C]laim preclusion requires three elements: '(1) the identity or privity of the parties to the present and prior actions, (2) identity of the cause of action, and (3) prior final judgment on the merits.'" Kobrin, supra, quoting DaLuz v. Department of Correction, 434 Mass. 40, 45 (2001).

"[I]ssue preclusion 'prevents relitigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or [parties in privity with the same parties].'" Kobrin, 444 Mass. at 843, quoting Heacock, 402 Mass. at 23 n.2. A party is precluded from relitigating an issue where "(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication," was essential to the earlier

judgment, and was actually litigated in the prior action.
Kobrin, supra, quoting Tuper v. North Adams Ambulance Serv.,
Inc., 428 Mass. 132, 134 (1998).

We focus on issue preclusion.  Here, the first and third
elements are plainly satisfied:  there was a final judgment on
the merits in the 1972 bill of complaint litigation, and the
essential issue in both cases is the same -- whether execution
of the lease of the Adams Academy to the Society constitutes a
breach of Quincy's fiduciary duty of loyalty.  The dispute
concerns the second element.

The successor trustee essentially makes two arguments why
the second element is not satisfied in this case.  First, he
claims that he was not a party to the 1972 litigation, because
he was not appointed until 2011, and that he should not be bound
by the adjudication of the earlier litigation because the
original trustee, Quincy, committed a breach of its fiduciary
duty of loyalty by seeking the decree it obtained.  We need not
dwell long on this argument.  We recognize that a successor
trustee may act on behalf of the beneficiaries in bringing a
claim of breach of fiduciary duty against the former trustee.
See O'Connor v. Redstone, 452 Mass. 537, 552 (2008).  But the
adjudication in 1972 determined that Quincy did not commit a
breach of its fiduciary duty by seeking the decree, because the
single justice approved the execution of the lease proposed in

the decree.  That adjudication arose from Quincy's exercise of the long-established privilege of a trustee to seek directions or approval of a proposed decision from a court in equity "to protect the trustee from the risks of future liability or controversy."  See Putnam v. Collamore, 109 Mass. 509, 512 (1872).  If such an adjudication did not bind a successor trustee, then it would not protect the trustee from the risks of future liability or controversy.  See generally Restatement (Second) of Judgments § 62 comment a (1982) ("a person standing in one of a variety of pre-existing legal relationships with a party may be bound by a judgment affecting that party").  The principles of res judicata thus require that a final adjudication remain binding on both the original parties and their successors in interest.  See Willett v. Webster, 337 Mass. 98, 101 (1958) (successors in interest are in privity with predecessors and entitled to same preclusion defense).  See also Leslie v. LaPrade, 726 A.2d 1228, 1231 (D.C. 1999) (successor trustee barred by res judicata from relitigating claims brought previously by former trustee).

The successor trustee's second argument requires greater attention.  The successor trustee claims that he is acting on behalf of the Adams Fund's sole income beneficiary, the Woodward School, which was not a party in the 1972 litigation.  He contends that issue preclusion can be applied against the School

only if the Attorney General, who was a party, was in privity with the School.  There was no privity here, the successor trustee claims, because the School had a special interest in the terms of the lease separate from the general public interest represented by the Attorney General.  To explore this argument, we must examine the meaning of privity, and then apply that meaning to the law of charitable trust administration and the oversight role of the Attorney General.

What this court said about privity in 1909 remains true today:  "[T]here is no generally prevailing definition of privity which can be automatically applied to all cases."  Old Dominion Copper Mining & Smelting Co. v. Bigelow, 203 Mass. 159, 214 (1909), aff'd, 225 U.S. 111 (1912).  See Jefferson Sch. of Social Science v. Subversive Activities Control Bd., 331 F.2d 76, 83 (D.C. Cir. 1963) ("The term privity is an elusive concept, without any precise definition of general applicability").  Instead, privity is best understood simply as a legal conclusion that follows from an analysis of the relationship between the parties to a prior adjudication and the party to be bound.  See Southwest Airlines Co. v. Texas Int'l Airlines, Inc., 546 F.2d 84, 95 (5th Cir.), cert. denied, 434 U.S. 832 (1977), quoting Vestal, Preclusion/Res Judicata Variables:  Parties, 50 Iowa L. Rev. 27 (1964) ("privity in itself does not state a reason for either including or excluding

a person from the binding effect of a prior judgment, but rather it represents a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to afford application of the principle of preclusion").

In the context of this case, the determination whether a nonparty is in privity with a party depends on the nature of the nonparty's interest, whether that interest was adequately represented by a party to the prior litigation, and whether binding the nonparty to the judgment is consistent with due process and common-law principles of fairness.[5]  See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard"); Hansberry v. Lee, 311 U.S. 32, 42 (1940) ("there [is] a failure of due process only in those cases where it cannot be said that the procedure adopted . . . fairly insures the protection of the interests of absent parties who are to be bound by it"); Massachusetts Prop. Ins. Underwriting Ass'n v. Norrington, 395 Mass. 751, 754 (1985),

---

[5] We do not mean to suggest that this line of inquiry must apply in all nonparty preclusion cases; some established grounds for preclusion, such as preclusion based on a prior agreement, do not require analysis as to the adequacy of representation. See Taylor v. Sturgell, 553 U.S. 880, 894-895 (2008) (identifying established grounds for nonparty preclusion under Federal common law).

quoting Mongeau v. Boutelle, 10 Mass. App. Ct. 246, 249-150 (1980) ("A nonparty to a prior adjudication can be bound by it 'only where [the nonparty's] interest was represented by a party to the prior litigation'"); Morganelli v. Building Inspector of Canton, 7 Mass. App. Ct. 475, 481 (1979) (question of privity "depends on the nature of the plaintiffs' interest, whether that interest was represented in [the prior litigation], and whether there are special circumstances or due process considerations which make it unfair to bind the plaintiffs to that judgment").

To determine the nature of the Woodward School's interest in the 1972 litigation, whether that interest was adequately represented by the Attorney General, and whether binding the School to the judgment is consistent with due process and common-law principles of fairness, we need to look closely at the law of charitable trusts. "A charitable trust, like a private trust, is a fiduciary relationship." 5 A.W. Scott, W.F. Fratcher, & M.L. Ascher, Scott and Ascher on Trusts § 37.1 at 2354 (5th ed. 2008) (Scott & Ascher). But whereas the trustee of a private trust owes a fiduciary duty to manage trust property "for the benefit of designated beneficiaries," "there are ordinarily no definite beneficiaries" in a charitable trust. Id. at 2354-2355. Rather, a charitable trust must provide some benefit to "either the public at large . . . or an indefinite class of persons." Kent v. Durham, 142 Mass. 216, 217 (1886).

A charitable trust is created for the benefit of "a broader community." Weaver v. Wood, 425 Mass. 270, 275 (1997), cert. denied, 522 U.S. 1049 (1998). It serves "to the greatest possible extent the public as the ultimate beneficiary." Attorney Gen. v. President & Fellows of Harvard College, 350 Mass. 125, 137 (1966). See generally Restatement (Second) of Trusts § 348 comment a (1959) (in charitable trust, "there need not be and ordinarily is not a definite beneficiary . . . , and the trustee is ordinarily not in a fiduciary relation to any specific person"). The designee of the charitable trust's income is not deemed the true beneficiary of the trust but instead the "conduit" of the trust's over-all charitable mission. G.G. Bogert & G.T. Bogert, The Law of Trusts and Trustees § 363 (rev. 2d ed. 1991).

Where a trustee of a private trust seeks direction or approval from a court in a matter that may adversely affect the rights of beneficiaries in the corpus of a trust, the designated beneficiaries must be parties to the action, and be given notice and an opportunity to be heard. See Shirk v. Walker, 298 Mass. 251, 262 (1937); Lincoln v. Aldrich, 141 Mass. 342, 342 (1886). But, because a charitable trust has a charitable mission rather than designated beneficiaries, our law recognizes the Attorney General as the appropriate party to "enforce the due application of funds given or appropriated to public charities within the

commonwealth and prevent breaches of trust in the administration thereof."  G. L. c. 12, § 8.  See Scott & Ascher, supra at § 37.3.1, at 2403 (chief difference between duties of trustee of charitable trust and duties of trustee of private trust "is that the duties of the trustee of a charitable trust are not ordinarily enforceable by specific beneficiaries; instead, they are enforced by the Attorney General").

It has long been established, under both our common law and § 8, that "[t]he duty of taking action to protect public charitable trusts and to enforce proper application of their funds rests solely upon the Attorney General as the representative of the public interests."  Ames v. Attorney Gen., 332 Mass. 246, 250 (1955).  The Attorney General is a required party in all judicial proceedings concerning charitable trusts. G. L. c. 12, § 8G.  And our decisions have frequently described the Attorney General's special responsibility to ensure the proper administration of charitable trusts.  See, e.g., Trustees of Dartmouth College v. Quincy, 331 Mass. 219, 225 (1954) ("It is ordinarily the exclusive function of the Attorney General to see that [a charitable trust established for the benefit of the public] is properly administered"); Dillaway v. Burton, 256 Mass. 568, 573 (1926) ("It is well settled that it is the exclusive function of the Attorney General to correct abuses in the administration of a public charity by the institution of

proper proceedings").  In short, the Attorney General serves as the guardian of the public interest with respect to charitable trusts and, when a trustee seeks direction or approval of the court, we expect the Attorney General's recommendation to be furnished after due diligence and careful consideration.  See Dillaway, supra at 575 ("The power and duty delegated to the Attorney General to enforce the proper application of charitable funds are a recognition by the Legislature . . . of his fitness as a representative of the public in cases of this kind").

Although our case law is replete with cases declaring that the Attorney General is the only person with standing to bring an action to correct abuses in the administration of a charitable trust, it is more accurate to declare that the Attorney General is the only person apart from a trustee who, on behalf of the general public served by the trust's charitable mission, has standing to bring such an action.  See In re Boston Regional Med. Ctr., 328 F. Supp. 2d 130, 147 (D. Mass. 2004), citing W.F. Fratcher, Scott on Trusts § 391, at 364-365 (4th ed. 1989).  Under the law of charitable trusts, a private plaintiff also has standing to bring claims against a public charity where the plaintiff "asserts an individual interest in the charitable organization distinct from that of the general public."  Maffei v. Roman Catholic Archbishop of Boston, 449 Mass. 235, 245 (2007), cert. denied, 552 U.S. 1099 (2008).  See Weaver, 425

Mass. at 275 (private plaintiff's standing arises from "personal right that directly affects the individual" beneficiary).  We implicitly recognized that the Woodward School meets this requirement of standing because we affirmed in part the order in Woodward School, 469 Mass. at 154, where the School was the sole plaintiff.

The named parties in the 1972 bill of complaint were the individuals who comprised the board of managers and board of supervisors of the Adams Fund;[6] the oldest living male descendant of President Adams;[7] the Attorney General; two ministers, two lawyers, two physicians, and a magistrate, all of whom resided in Quincy; and two churches located in Quincy.[8]  The Woodward

---

[6] "[T]he board of supervisors and the board of managers shared responsibility for overseeing the Adams Fund."  Woodward Sch. for Girls, Inc. v. Quincy, 469 Mass. 151, 154 n.6 (2014) (Woodward School).

[7] The only principal beneficiary identified in the deed of trust was the oldest living male descendant of President John Adams, "who was to receive the principal only on 'gross corruption or mismanagement,' or knowing waste" by Quincy, as trustee.  Woodward School, 469 Mass. at 154.

[8] In President Adams's deed of trust, he instructed that rents from the properties he conveyed into the trust be placed in a public fund and that, once the fund grew to a sufficient size, the monies be used to construct a place of religious worship and, after that construction was completed, "applied to the support of a School for the teaching of Greek and Latin languages, arts and sciences, which a majority of the ministers, magistrates, lawyers, and physicians, inhabiting the said town, may advise."

[9] For purposes of our review of the single justice's allowance of the defendants' motions for summary judgment, we

School, however, was not named as a party in the 1972 equity proceeding, and there is no information in the record to suggest that it was given notice of the action.  As a consequence, the Woodward School had no opportunity to be heard in that proceeding or to seek to intervene in that proceeding so that it might be heard regarding the propriety of the proposed lease.

In determining whether the successor trustee, acting on behalf of the Woodward School, should be bound by that adjudication and precluded from relitigating the issue whether Quincy's execution of the lease comported with its fiduciary duty of loyalty as a trustee of a charitable trust, we consider first whether the School's interest in the equity proceeding was adequately represented by a party to that prior litigation, specifically the Attorney General.  The successor trustee contends that the Attorney General could not have adequately represented the School's interest because the Attorney General represented only the public interest in the Adams Fund's charitable mission, not the distinctly different individual interest of the School in the fund.

We need not decide here whether the Attorney General, because of the Attorney General's duty to ensure that charitable trusts are adequately administered, must always be deemed to

accept the successor trustee's assertion that the School was given no notice and did not learn of the 1972 action before its final adjudication.

adequately represent <u>all</u> charitable interests in an equity action brought by a trustee of a charitable trust. It suffices that we conclude that, in light of the nature of the School's interest in this underlying litigation, the then Attorney General, because of his statutory and common-law duty to protect the public interest in charitable trusts, must be deemed to have adequately represented that interest. The crux of the equity litigation in 1972 was whether Quincy would be in violation of its fiduciary duty of loyalty if it executed the proposed lease that relieved the Adams Fund of the financial burden of maintaining the Adams Academy but charged the Society a relatively nominal rent of only $1,200 per year for fifty years. The nature of the School's interest in that litigation was the amount of net income to be derived by the Adams Fund from the Adams Academy property, which the School would receive as the Adams Fund's sole beneficiary. The students of the School were among the public beneficiaries of the Adams Fund that the Attorney General had a duty to represent, and they shared the School's interest in the amount of net income to be yielded from this property, because that income would be used for the students' education. "A party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative are aligned . . . ; and (2) either the party understood herself to be acting

in a representative capacity or the original court took care to protect the interests of the nonparty" (citation omitted). Taylor v. Sturgell, 553 U.S. 880, 900 (2008) (Federal common law of preclusion). With respect to the interest in maximizing the net income arising from the lease, the interests of the School and the Attorney General were aligned, and we must infer that the Attorney General recognized his obligation to represent the public interests served by the charitable trust under § 8, and that this court recognized its obligation to protect both the School and its students.

We consider next whether, even if the Attorney General adequately represented the School's interest in the equity litigation, it would be inconsistent with due process and common-law principles of fairness to bind the successor trustee to that adjudication where the School was not given notice of the action to approve the proposed lease and had no opportunity to be heard.[9] The successor trustee's argument rests on the premise that Quincy was legally obligated in 1972 to give notice of its bill of complaint to the School. But we have found no statute, rule, or appellate case that indicates that the trustee of a charitable trust was legally obligated in 1972 to give

_____

[9] For purposes of our review of the single justice's allowance of the defendants' motions for summary judgment, we accept the successor trustee's assertion that the School was given no notice and did not learn of the 1972 action before its final adjudication.

notice to an income beneficiary of an action in equity seeking instructions as to the management of the trust. Based on our understanding of the case law, the prevailing view of the law in 1972 was that, because it was the "exclusive function" of the Attorney General to protect the public interests from abuse in the administration of a public charity, see, e.g., Dillaway, 256 Mass. at 573, it was sufficient in such actions to give notice to the Attorney General rather than individual charitable beneficiaries. See id. at 575 ("power and duty delegated to the Attorney General" reflects Legislature's recognition "of the necessity of protecting public charities from being called upon to answer to proceedings instituted by individuals, with or without just cause, who have no private interests distinct from those of the public").[10] Where there was no legal obligation to give notice of the equitable action to an income beneficiary of

---

[10] We emphasize that we conclude only that a trustee of a charitable trust at the time of the 1972 decree did not have this legal obligation. We recognize that under the Massachusetts Uniform Trust Code enacted in 2012, "a trustee shall keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust," G. L. c. 203E, § 813 (a), and that, under certain circumstances, "[a] charitable organization expressly designated to receive distributions under the terms of a charitable trust shall have the rights of a qualified beneficiary," G. L. c. 203E, § 110 (b). See Understanding and Using Trusts § 18.7 (Mass. Cont. Legal Educ. 3d ed. 2014 & Supp. 2016) (any action seeking court authority to "reform, modify, or clarify the trust's provisions . . . must include the [A]ttorney [G]eneral as an interested party, and any charitable organization named as a beneficiary in the trust will be a 'qualified beneficiary' entitled to notice").

a charitable trust, and where in the circumstances of this case the Attorney General adequately represented the relevant interest of the income beneficiary, the denial of issue preclusion would defeat the purpose of the equitable action itself, which was to protect the trustee from any subsequent claim that it had committed a breach of its fiduciary duty by executing the lease.

Therefore, we conclude that the single justice correctly determined that the Woodward School was bound by the adjudication of the 1972 litigation, which implicitly determined that execution of the lease would not violate Quincy's fiduciary duty of loyalty. As such, the successor trustee is now precluded from claiming on behalf of the School that Quincy committed a breach of its fiduciary duty of loyalty by executing the lease. Consequently, we therefore affirm the single justice's allowance of the defendants' motions for summary judgment.[11]

---

[11] Our conclusion that the successor trustee is precluded from challenging the adjudication of the 1972 litigation does not mean that he is absolutely barred from seeking relief in equity regarding the remaining years of the lease. This court's decree in 1972 authorized Quincy to execute the proposed lease and implicitly concluded that Quincy's execution of the lease would not constitute a violation of its fiduciary duty of loyalty, but it also provided that "the parties may apply to this Court from time to time as may be necessary for further instructions or directions on a new bill or petition." We take no view as to whether there are reasonable grounds for such an application.

<u>Judgment affirmed</u>.