NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

23-P-391                                              Appeals Court

THOMAS P. JALKUT, trustee,[1] vs. CITY OF QUINCY & others.[2]

No. 23-P-391.

Norfolk.      January 8, 2024. – April 30, 2024.

Present: Milkey, Massing, & Neyman, JJ.

Collateral Estoppel. Judgment, Preclusive effect. Trust, Charitable trust, Assets of trust. Deed, Construction. Real Property, Deed, Ownership. Municipal Corporations, Property. Practice, Civil, Judgment on the pleadings.

Civil action commenced in the Supreme Judicial Court for the county of Suffolk on October 4, 2019.

Motions to intervene and to amend the complaint were heard by Kimberly S. Budd, C.J.

Following transfer to the Superior Court Department, the case was heard by Paul D. Wilson, J., on a motion for judgment on the pleadings.

---

[1] Of the Adams Temple and School Fund. Thomas P. Jalkut was substituted as successor trustee in the place of the original plaintiff, James R. DeGiacomo. To avoid confusion, we refer to DeGiacomo as the successor trustee and to Jalkut as the current trustee.

[2] The Woodward School for Girls, Inc.; Quincy Historical Society; and the Attorney General.

James S. Timmins, City Solicitor, for city of Quincy.

Nelson G. Apjohn for the plaintiff.

John C. Blessington for The Woodward School for Girls, Inc.

MILKEY, J.  This is the latest chapter of a long-running saga regarding the administration of certain gifts that President John Adams made in 1822.  See DeGiacomo v. Quincy, 476 Mass. 38 (2016); The Woodward Sch. for Girls, Inc. v. Quincy, 469 Mass. 151 (2014) (Woodward School).  The current dispute involves the ownership of an acre and a half parcel located at 8 Adams Street in the city of Quincy (city).  The competing claimants to title are the Adams Temple and School Fund (Adams Fund) and the city, which formerly served as trustee of the Adams Fund.  In 2019, the person who succeeded the city as trustee of the Adams Fund (successor trustee) sought judicial approval to sell the land.  The city moved to intervene, claiming that the parcel in question was never part of the Adams Fund.  While that dispute was playing out, the city recorded an order of taking that seized the property by eminent domain. Although the city's taking resolved who owns the property going forward, it did not fully moot the dispute, because resolution of the city's claim that it already owned the property prior to the taking obviously is critical to how much just compensation, if any, the Adams Fund is owed.  Following an assented-to substitution of trustees, a Superior Court judge allowed the

current trustee's motion for judgment on the pleadings based on the preclusive effect of earlier litigation that had treated the property as part of the Adams Fund.  Because we agree with the judge that the ownership of the property already had been adjudicated, we affirm.

Background.  1.  The deeds.  By an initial deed dated June 29, 1822, President Adams transferred to the city two "[p]astures" that he had acquired.[3]  It is undisputed that such land was given to the city in trust to fund the building of a Congregational "Temple to be built of stone, to be taken from the premises," as well as of a "School for the teaching of the Greek and Latin languages, [and] arts and sciences."  In a related transaction that occurred a month later, President Adams deeded various additional parcels to the city, including one to be used as the actual site of the school referenced in the earlier deed.  The second deed specified that the "School House," like the church, was to be constructed of stone, and that the building "shall be erected over the cellar which was under [a particular] house," the historic nature of which the deed chronicled in flowery detail, including the house's

---

[3] For simplicity, we refer to Quincy as a city even though for much of the relevant time period, it remained a town.

significance as the birthplace of John Hancock.[4]  The deed also spelled out in detail President Adams's personal thoughts about the curriculum to be taught at the school, including a prolonged discussion of the merits of learning Latin, Greek, and Hebrew. The property in dispute traces to this second deed.

2.  <u>The Adams Academy</u>.  President Adams died on July 4, 1826, and decades went by before his wish for a school on his former land became a reality.[5]  In 1870, a granite schoolhouse was constructed at 8 Adams Street, and a private school known as

---

[4] According to the deed, the house whose cellar would be used to build the new school was:

"anciently built by the Rev. Mr. John Hancock, the father of John Hancock, that great generous[,] disinterested, bountiful benefactor of his country, once President of Congress, and afterwards Governor of this State, to whose great exertions and unlimited sacrifices this nation is so deeply indebted for her independence and present prosperity, who was born in this house; and which house was afterwards purchased and inhabited by the reverend, learned, ingenious, and eloquent Lemuel Bryant, Pastor of this congregation; which house was afterwards purchased [and] inhabit[ed] by an honorable friend of my younger years, Col. Josiah Quincy, and also inhabited by his son, Josiah Quincy Junior[,] a friend of my riper years, a brother barrister at law, with whom I have been engaged in many arduous contests at the Bar, who was as ardent a patriot as any of his age, and, next to James Otis, the greatest orator."

[5] Under the deeds, the "temple" was to be constructed first, with the school to be constructed only once sufficient additional funds had been generated from trust assets.  The church, which became First Parish Church, was completed in 1828. According to the city, sufficient income to build the school did not accumulate until much later.

the Adams Academy opened there two years later.  Hence, the parcel has become known as the Adams Academy property.  Sadly, the school closed in 1907.  The granite school building still stands, and it has been designated a national historic landmark.

3.  <u>The cy pres actions</u>.  The demise of the Adams Academy left the Adams Fund without a designated beneficiary.  In 1918, a single justice of the Supreme Judicial Court issued a decree that, by application of the cy pres doctrine, allowed the city to use income from the Adams Fund for its public high school and public library.  In 1953, however, the city brought another cy pres action to designate The Woodward School for Girls (Woodward School) as the income beneficiary of the Adams Fund.[6]

4.  <u>The Quincy Historical Society lease</u>.  The Woodward School has its own campus and therefore does not itself occupy the Adams Academy property.  In 1972, with the express prior approval of a single justice of the Supreme Judicial Court, the city leased the Adams Academy building and property to the Quincy Historical Society for a term of fifty years.[7]  The monthly rent was a nominal $100.

---

[6] The Woodward School was founded by Dr. Ebenezer Woodward, a cousin of John Adams.  Following President Adams's example, Dr. Woodward in 1894 left property in trust to the city to generate income and eventually establish a school for girls.

[7] The Quincy Historical Society was founded by Charles Francis Adams, Jr., the great-grandson of President Adams and

5.  <u>The Woodward School litigation</u>.  Over time, the Woodward School became concerned that it might not be receiving the beneficence to which it legally was entitled.  In part, this related to the fact that the repurposing of the Adams Academy building to a different public end had the effect of limiting the income that the property would generate for the designated beneficiary.  In 2007, the school brought an accounting action against the city, in its capacity as trustee of the Adams Fund, regarding its administration of the Adams Fund (Woodward School litigation or Woodward case).[8]  The school later amended its action to add a claim that the city had breached the fiduciary duties it owed to the school.

Following extensive fact-finding by a special master and a thirteen-day trial, a Probate and Family Court judge ruled in favor of the Woodward School.  Finding that the city had breached its fiduciary duties to the school in its administration of the trust assets, the final judgment removed the city as trustee of the Adams Fund, and appointed the successor trustee in its place.

_____

the grandson of President John Quincy Adams.  See National Park Service, Charles Francis Adams (1807-1886), https://www.nps.gov/adam/learn/historyculture/charles-francis-adams-1807-1886.htm [https://perma.cc/4QQ5-G5E5].

[8] The litigation also involved the city's administration of a separate fund that had been created by a bequest from Charles Francis Adams, Sr., for the support of the Adams Academy.

In ruling in favor of the Woodward School, the probate judge issued 220 paragraphs of findings. One does not have to delve deeply into those findings to see that the judge unquestionably viewed the Adams Academy property as an asset of the Adams Fund that President Adams had placed in trust by operation of the second 1822 deed; this is established by the opening paragraphs.[9] In fact, the judge went on to treat the Adams Academy parcel not only as a trust asset, but as "the most valuable asset in the Adams Temple and School Fund." The judge found that the city had breached its fiduciary duties to the Woodward School in several respects, including by "its effectuating a 50 year lease [for the Adams Academy parcel] to the Quincy Historical Society." The judgment enjoined the city from renegotiating the terms of that lease prior to the successor trustee's assuming that role, and it expressly

---

[9] In paragraphs two and three of the findings, the judge expressly found that by means of the first 1822 deed, "President Adams conveyed a portion of his real estate holdings into a trust," and that by means of the second 1822 deed, "President Adams made a further conveyance into the trust." Then, in paragraph four, the judge found that "by said two deeds, as of July 27, 1822, President John Adams had conveyed into a trust, which trust was thereafter referred to as the 'Adams Fund,' and later the 'Adams Temple and School Fund,' one hundred and sixty-one and a half acres of land, plus two additional parcels of land of unknown acreage, in Quincy and Braintree."

recognized that the new trustee could sell the Adams Academy property thereafter.[10]

The city appealed, arguing in part that the judge's finding that it had breached its fiduciary duties was erroneous in some respects.  See Woodward School, 469 Mass. at 153.  The city did not argue that the judge erred in treating the Adams Academy property as part of the Adams Fund, and, in any event, the city lost its appeal as to liability.  Id.  The city prevailed with respect to damages, and the damages award was modified on remand (with no further appeal taken).

6.  The DeGiacomo litigation.  The fifty-year lease under which the Quincy Historical Society was occupying the Adams Academy property was not due to expire until 2022.  In 2014, the successor trustee filed an action seeking to rescind that lease and seeking restitution (DeGiacomo litigation).  See DeGiacomo, 476 Mass. at 40.  In that action, the successor trustee sought to rely on the fact that the probate judge in the Woodward School litigation already had determined that the city had

---

[10] While making it clear that he was "not, in any manner, directing the successor Trustee to sell the Adams Academy property," the judge noted that "[t]he present rate of return on the property is approximately 0.00064 percent."  The judgment also stated that "[t]he successor Trustee should, over the coming years, take such action as is prudent with regard to the property in keeping with the interests of the income beneficiary while preserving, to the greatest extent possible, the historic and unique nature of the Adams Academy."

breached its fiduciary duties by entering into that lease.  Id.
Together with the Quincy Historical Society, the city defended
the action by pointing to the fact that its entering into the
lease specifically had been authorized by the 1972 judgment
issued by a single justice of the Supreme Judicial Court.  Id.
Thus, the parties raised dueling claims of issue preclusion.
After grappling with the fact that the Attorney General, but not
the Woodward School, had been a party to the 1972 litigation,
the Supreme Judicial Court ruled in favor of the city.  Id. at
42-49.  The court reasoned that the city was entitled to rely on
the preclusive effect of the 1972 judgment, because the very
purpose of that litigation "was to protect the trustee from any
subsequent claim that it had committed a breach of its fiduciary
duty by executing the lease."  Id. at 49.

7.  The current action.  In 2019, the successor trustee
filed a new equity action seeking judicial approval to sell the
Adams Academy property subject to the lease.  The city sought to
intervene in that action claiming -- for the first time -- that
it, not the successor trustee, actually owned title to the
property.  In support of that claim, the city pointed to
differences in the wording of the two 1822 deeds:  the first
deed included express trust language, while the second one
deeded the property "to the inhabitants of the town of
Quincy . . . in their corporate capacit[ies]."  As a result, the

city argued, the land itself was given to the city in ordinary fee simple free of the trust, and only the Adams Academy building (which had been built with trust income) was a trust asset. The city maintained that the judgment entered in the Woodward School case therefore did not transfer title to the Adams Academy property to the successor trustee and that title instead remained with the city.

A single justice of the Supreme Judicial Court denied the city's motion to intervene after concluding -- in light of the judgment in the Woodward School case -- that the city's claim to title of the Adams Academy property was barred by issue preclusion. While the city's interlocutory appeal of the denial of its motion to intervene was pending, the city recorded its order of taking. This prompted the successor trustee to move to amend his complaint. The single justice allowed that motion and, in doing so, she specified that her earlier ruling on the city's motion to intervene should not be viewed as a definitive resolution of whether the city was precluded from raising its new claim that it held title to the land portion of the Adams Academy property.[11] She transferred the matter to the Superior

---

[11] Specifically, the single justice stated as follows: "Although I denied the city's motion to intervene on the basis that it is precluded from raising the ownership issue, my order did not focus on the distinction between ownership of the

Court, with the directive that a judge there resolve "whether ownership of the land was definitively adjudicated in the earlier litigation and whether the city is thus precluded from relitigating the matter."

In the Superior Court, the successor trustee filed a new complaint that named the city as a defendant, and the city filed a counterclaim that asserted its claim of title to the land portion of the Adams Academy property.  As noted, the current trustee filed a motion for judgment on the pleadings based on issue preclusion and related grounds.[12]  In a thoughtful and comprehensive opinion, the Superior Court judge ruled in the current trustee's favor, and a judgment declaring that the Adams Fund was the legal owner of the property, including the land, entered accordingly.

Discussion.  If viewed as an original matter, the city's claim that it held title of the Adams Academy property prior to the taking would not be without some force.  The two 1822 deeds executed less than a month apart do indeed utilize quite

---

building and ownership of the land, the latter of which is now the key issue in dispute."

[12] The current trustee also argued claim preclusion and judicial estoppel.  The judicial estoppel argument was based on the city's having successfully defended the DeGiacomo litigation by arguing that the 1972 decree authorized the city to lease the Adams Academy property in its capacity as trustee.  Given how we rule, we need not reach those alternative grounds.

different language, thereby providing some support for an argument that a different form of ownership was intended. Cf. Boston Safe Deposit & Trust Co. v. Wilbur, 431 Mass. 429, 433-434 (2000) (deriving intent of testator from use of certain language in one part of will and omission of such language in another). At a minimum, it is not immediately clear why the grantor here -- among the most storied legal draftsmen in Massachusetts history -- chose different language in the two deeds.[13] This is not to say that the interpretation of the second 1822 deed that the city now offers necessarily would have prevailed had the city timely raised it.[14] In the end, we need not resolve that debate, because we agree with the Superior Court judge that it is too late for the city to assert that President Adams did not transfer the Adams Academy property into the Adams Fund.

---

[13] Adams's reputation for legal draftsmanship was principally forged in areas outside of conveyancing practice.

[14] We note that the city appears to acknowledge that it was given some trust-like duties with respect to the Adams Academy property even if the property was not formally held in trust. See American Inst. of Architects v. Attorney Gen., 332 Mass. 619, 624 (1955) (property not formally held in trust may still be subject to "quasi trust"). We additionally note that the city's position that the legal effect of the second deed was the neat result that the city would own the land while the Adams Fund would own the building lacks some degree of doctrinal coherence.

Before turning to the elements of issue preclusion, we address the fact that the judgment did not, by its express terms, transfer the deed to the Adams Academy property to the successor trustee. But nor did that judgment order the city to transfer any other property held in the Adams Fund to the successor trustee. Rather, it is plain that the judgment presupposed that the substitution of trustees by itself was sufficient to effect a transfer of title to trust assets.[15] The city has not argued that such a transfer could have been accomplished only by separate transaction.[16] Rather, the gravamen of the city's argument is that the Adams Academy property was never a trust asset to begin with but instead was

---

[15] This is well illustrated by how the judgment handled a different parcel of trust land. One of the disputes at the trial of the Woodward School case involved a small parcel known as the Vigoda property. That property was a net drain on city resources, and the city in fact disclaimed that it owned it in trust. The probate judge found that the city did own that property in trust and that it in fact had violated its fiduciary duties by retaining it. By way of relief, the judge ordered the successor trustee to deed the property back to the city (thus allowing the Adams Fund to shed a property that had a negative income). This presupposed that the appointment of the successor trustee would transfer title from the city to the successor trustee by operation of law.

[16] At common law, the mere appointment of a successor trustee was not deemed sufficient to transfer title to property held in trust. See Glazier v. Everett, 224 Mass. 184, 187 (1916), citing Peabody v. Eastern Methodist Soc'y in Lynn, 5 Allen 540 (1863). That principle since has been eroded by statute. Glazier, supra at 187-188. We need not address this issue further because no party has raised it, and it therefore long since has been waived.

held by the city outside of the Adams Fund.  We turn to whether that issue was resolved by prior litigation.

To establish issue preclusion, a litigant must demonstrate the following:  "(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party . . . to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication, was essential to the earlier judgment, and was actually litigated in the prior action" (quotation and citation omitted).  DeGiacomo, 476 Mass. at 42.  The city argues that the third prong was not met, because title to the Adams Academy property was not at issue in, or decided by, the Woodward School litigation.  Instead, the city maintains, the dispute over title arose only later when the successor trustee sought to sell the property.  We are unpersuaded.

As laid out above, the Woodward School brought the 2007 litigation for an accounting of the Adams Fund assets and for breach of the city's fiduciary duties with respect to those assets.  Hence, central to both types of claims was the question of what assets held by the city were subject to the trust.  The judge specifically found that the Adams Academy property was a trust asset, and the judgment expressly recognized the successor

trustee's ability to sell that very parcel. The issue the city now seeks to contest was decided.

We recognize that the DeGiacomo court declined to recognize the full preclusive effect of the judgment entered in the Woodward School litigation, and that it, in effect, allowed the city to mount a collateral attack on that judgment insofar as it related to the leasing of the Adams Academy property. See DeGiacomo, 476 Mass. at 40-41. However, we view the import of that aspect of the DeGiacomo case as limited to the special circumstances presented there in which a trial court judge adjudicated a legal question in a way that the court viewed as at odds with an earlier judgment issued by a single justice of the Supreme Judicial Court. Id. at 49. It was under those unusual circumstances that the DeGiacomo court held that the preclusive effect of the earlier judgment trumped the preclusive effect of the subsequent one. Id. In the appeal before us, unlike in DeGiacomo, the city is unable to point to any similar reason why the preclusive impact of the judgment in the Woodward School litigation should be ignored.

We conclude by pausing to reflect on where the matter now stands. In 2011, the trial judge in the Woodward School case observed that: "[w]ere he to be with us today, President Adams would, most assuredly, not be pleased with the events of the past fifty-seven years." Now, three appeals later, one can only

imagine how chagrined President Adams might be that the legal dispute over his gifts continues unabated. We recognize that today's ruling resolves only the narrow issue presented to us; much remains unresolved, including the amount of just compensation that the city owes the Adams Fund for the Adams Academy property. We express no view on how the potentially difficult issues subsumed by that question should be resolved. As we sit in the court house that bears President Adams's name, we are left simply to urge the parties to pursue final resolution of this matter with the public-spiritedness that he long exemplified.[17]

<u>Judgment affirmed.</u>

---

[17] Arguing that the city's appeal was frivolous, both the current trustee and the Woodward School have requested that we require the city to pay reasonable attorney's fees they incurred in defending it. See Mass. R. A. P. 25, as appearing in 481 Mass. 1654 (2019). We are not unsympathetic to those requests, and we view the particular legal arguments put forward by the city as relatively weak. Viewing all relevant considerations, however, we ultimately decline to order sanctions. For one thing, although the ultimate issue we need decide is relatively straightforward, it lies embedded within a dispute of historic complexity. For another, strictly speaking, it was the successor trustee who ultimately pressed for resolution of the city's new argument. Having already convinced the single justice that issue preclusion precluded the city from intervening, it was the successor trustee who moved to amend his complaint to take on the city's claim.